**UNITED STATES of America**

**v.**

**Patricia Ann WRIGHT, Appellant.**

**UNITED STATES of America**

**v.**

**Shirley Ann BOYD, a/k/a Kim, a/k/a Lisa, Appellant.**

**Nos. 77–1990, 77–1991.**

United States Court of Appeals, District of Columbia Circuit.

Argued Feb. 22, 1979.

Decided Aug. 27, 1979.

As Amended Sept. 28, 1979.

Mary Gallagher, Washington, D. C. (appointed by this Court), for appellants.

John H. Sturc, Asst. U. S. Atty., Washington, D. C., with whom Earl J. Silbert, U. S. Atty., John A. Terry, Peter E. George and James F. Rutherford, Asst. U. S. Attys., Washington, D. C., were on the brief, for appellee.

Before MacKINNON and WILKEY, Circuit Judges, and RICHEY,* United

* Sitting by designation pursuant to 28 U.S.C. § 292(a).

States District Judge for the United States District Court for the District of Columbia.

Opinion for the Court filed by Circuit Judge MacKINNON.

MacKINNON, Circuit Judge:

Acting on a search warrant issued in the name of the "United States District Court for the District of Columbia" by a United States Magistrate, Metropolitan Police officers seized $2,100 and some narcotics and narcotic paraphernalia from appellants during a drug raid. Thereafter appellants were indicted by the United States grand jury for one United States and one District of Columbia drug offense. The latter was a lesser offense. After all charges against appellants arising out of the search were dismissed by the district court, appellants filed a motion asking the district court to order the return of the $2,100. The district court refused, holding that appellants were not entitled to the money. We reverse and remand.

I

On October 8, 1976, a United States Magistrate signed a warrant issued out of the United States District Court for the District of Columbia for a search of the premises at 1341 T Street, Northwest.[1] There was probable cause to believe that heroin and narcotics paraphernalia were concealed in the building. The warrant was executed that afternoon by Metropolitan Police who seized drugs, drug paraphernalia, weapons and money all of which was listed in the inventory filed on October 12, 1976.[2] Fif-

---

[1] 
UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

Docket No. 76-

Case No. 1381 M (C)

UNITED STATES OF AMERICA

vs.

ENTIRE PREMISES
1341 T Street, N.W.
Washington, D.C.

SEARCH WARRANT

To CHIEF OF POLICE OR ANY MEMBER OF MPDC
Affidavit(s) having been made before me by _____ that he has reason to believe that on the premises known as
ENTIRE PREMISES
1341 T Street, N.W.
Washington, D.C.
Washington in the District of Columbia there is now being concealed certain property, namely heroin, capsules, envelopes, syringes, tourniquets, cookers and paraphernalia used in the preparation of heroin for distribution or use and any other instrumentalities or evidence of illegal possession or dispensation of heroin or of any other narcotic drugs illegally held. Also records, that is, documents of a commercial character which establish or confirm illegal narcotic activity, identify the perpetrator or perpetrators and their role in the operation, and demonstrate their control over the premises to be searched, which are in violation of Title 21 U.S.Code Section 841(a) and Title 33 D.C.Code Section 402. See the facts set forth in the affidavit attached hereto and made a part hereof, and as I am satisfied that there is prob-

able cause to believe that the property so described is being concealed on the person or premises above described and that the foregoing grounds for application for issuance of the search warrant exist.

*You are hereby commanded* to search within a period of 24 hrs. (not to exceed 10 days) the person or place named for the property specified, serving this warrant and making the search at anytime in the day or night[1] and if the property be found there to seize it, leaving a copy of this warrant and a receipt for the property taken, and prepare a written inventory of the property seized and promptly return this warrant and bring the property before me as required by law.

ORIGINAL

Dated this 8th day of October, 1976.
/s/ Lawrence S. Margolis
Judge or Federal Magistrate

[1] The Federal Rules of Criminal Procedure provide: "The warrant shall be served in the daytime, unless the issuing authority, by appropriate provision in the warrant, and for reasonable cause shown, authorizes its execution at times other than daytime." (Rule 41(C))

[2] The following is an inventory of property taken pursuant to the warrant:
3 large glassine bags containing brownish white powder
1 tinfoil containing brownish white powder
Syringe and needle with clear fluid
Measuring spoons
Strainer
1—$100.00 bill, 64—$20.00 bills, 52—$5.00 bills
1—$50.00 bill, 35—$10.00 bills, 59—$1.00 bills
1—$2.00 bill

teen hundred dollars ($1,500) of the money was seized from the person of appellant Patricia Ann Wright and $600 from a dresser in a room "used" by Wright and appellant Shirley Ann Boyd.[3] During the search seven persons present in the building were arrested.

Appellants Wright and Boyd, along with two men, arrested at the time of the search, were charged in an indictment issued by the Grand Jury convened by the United States District Court for the District of Columbia, with possession with intent to distribute a controlled substance (a United States offense)[4] and possession of a narcotic drug (a District of Columbia offense).[5] On January 12, 1977, the Government moved in federal court to dismiss the indictment against appellants apparently on the ground that the Government did not have sufficient evidence to go forward at that time. (Tr. April 19, 1977, 6). The motion was granted. On March 1, 1977, appellants were reindicted for the same crimes and appellants again moved for dismissal of the indictments. On April 19, 1977, the indictment was again dismissed, with prejudice.

Appellants then renewed their motion in the United States District Court, which had originally been made when the first indictment was dismissed, for return of the money ($1500 and $600) seized during the October 8, 1976 raid. On September 28, 1977, a hearing was held in federal district court on the motion to return the property.

At the hearing on the motion appellants' only witness was Metropolitan Police Detective Budai who had obtained the warrant and had participated with others in the October 8th search, seizure and arrests. He testified as follows: The $1500 was taken from Patricia Wright's "pocket,"[6] "off her person,"[7] while she was in the "bathroom or hallway."[8] The $600 was taken from the "dresser"[9] in the second floor bedroom that Boyd and Wright said they "stayed in"[10] and "used."[11] The $600 was "found in the bedroom with her [Wright]."[12] Detective Budai also testified that "inside the same room as the money [$600] . . . there was narcotics paraphernalia . . . strainers, measuring spoons, tinfoil, cutting board . . . [that] would be used to dilute narcotics, heroin . . . [f]or cutting and distribution."[13]

Appellants rested their case on the testimony of Detective Budai. They had been indicted later for other offenses, and neither appellant testified apparently because each desired to avoid cross-examination because of the subsequent indictments or the threat thereof. Wright's attorney made the very plausible contention:

> It seems to me quite plain that if somebody seizes money out of somebody's pocket, that not much further inquiry is necessary.
>
> This money was taken from her [Wright's] pocket and every presumption must be that it belonged to her and I don't see any need for her to take the stand.

One Grenfield Mod. 50 12 Ga. shotgun serial no. 60315016
One Colt 25 Cal. automatic pistol

**3.** Appellants' counsel maintains that appellants lived in the room. The government focuses on Boyd's statement that they "used" the room, and that "she did not state that either person actually lived there." Gov't Br. 8. This is relevant to whether appellants owned the $600, and is discussed in text accompanying notes 40–41 *infra.*

**4.** 21 U.S.C. § 841(a) (1977).

**5.** 33 D.C.Code § 402 (1973). Congress has provided that offenses against the District of Columbia may be included in indictments charging federal offenses and the joined offenses may be tried in the United States District Court. 11 D.C.Code § 502(3) (1973).

**6.** Tr. September 28, 1977 [hereinafter Tr.] 9.

**7.** *Id.* 12.

**8.** *Id.* 13.

**9.** *Id.* 17.

**10.** *Id.* 13.

**11.** *Id.* 11.

**12.** *Id.* 9.

**13.** *Id.* 16, 17.

Tr. 21. The theory of Boyd's attorney was similar:

> We are going . . . on the officer's testimony that money was seized from her room and that Miss Boyd indicated that she and Miss Wright stayed there, we submit that this should be sufficient evidence at this time of ownership of these funds and we are prepared to stand on his testimony. . . . we are prepared to submit on the claim of ownership based on the officer's testimony that he seized the money from the room where she indicated she stayed at these premises.
>
> We believe that the Government has not met its burden to show in the light of the decision of the Circuit Court in the case of Ruben Wilson v. the United States that these are either proceeds of crime or contraband and we would ask the Court to sign an appropriate order returning the money to Miss Boyd.

Tr. 20, 23. Miss Wright "joined" in Boyd's argument.

The Government broadly contended that the court could conclude the money was the "proceeds of . . . crime" because there was "narcotics activity . . . at that house by one of the defendants who was claiming the money," Tr. 18, and because *"the money was found along with narcotics paraphernalia and cutting material."* Tr. 23 (emphasis added). Such relationship is too tenuous.

The district court denied appellants' motions. It noted that (1) "three individuals were convicted" for *subsequent* narcotics offenses involving the same premises, Tr. 24–25; (2) "there was a substantial amount of money and large amounts of narcotics found in the premises . . . where these two ladies were arrested" Tr. 25; and (3) appellants filed affidavits of indigency in order to obtain attorneys under the Criminal Justice Act, Tr. 25–26. The court concluded that "[u]nder all of the circum-

stances here I cannot hold that these two ladies were owners of that money found in the house." [14]

Wright and Boyd appeal from that decision. The Government urges us to affirm the district court not only because they assert appellants are not entitled to the money, but also because the district court allegedly lacks jurisdiction to order it returned.

## II

The Government now contends for the first time in this case that the District Court lacks jurisdiction to order return of the money. First, the Government contends that the district court lacks subject matter jurisdiction. Second, the Government maintains that the court lacks personal jurisdiction over the person holding the property, so that "any order by the District Court to release the money to appellants would be a nullity." [15] We reject both of these arguments.

### A

In *United States v. Wilson,* 176 U.S.App. D.C. 321, 540 F.2d 1100 (D.C. Cir. 1976), we ruled that in such circumstances the district court has subject matter jurisdiction to order return of the money. Wilson pleaded guilty to possession of marijuana with intent to distribute it. He then moved for return of over two thousand dollars that had been seized by the Metropolitan Police pursuant to a United States Magistrate's search warrant issued out of the United States District Court.[16] The Government opposed the motion, and it was denied by the district court. We reversed and ordered the money returned, saying:

> [I]t is fundamental to the integrity of the criminal justice process that property involved in the proceeding, against which no Government claim lies, be returned promptly to its rightful owner. Therefore, the district court has both the juris-

---

14. *Id.* 24–26.

15. Gov't Br. 12.

16. For about one year after the seizure the money was held by the property clerk of the Metropolitan Police District. It was then transferred into the General Revenue fund of the District of Columbia.

diction and duty to return such property.[17]

*Wilson* is consistent with the decisions of every circuit that has considered this issue. In *United States v. Premises Known as 608 Taylor Avenue,* 584 F.2d 1297 (3d Cir. 1978), which involved a motion (filed before any criminal charges were brought) for return of lawfully seized money, the court stated: "If the government's retention is unreasonable considering all circumstances, the district court as a matter of its supervisory powers should order the return of the seized property."[18] The Sixth Circuit, citing *Wilson* also stated in *United States v. LaFatch,* 565 F.2d 81, 83 (6th Cir. 1977), *cert. denied,* 435 U.S. 971, 98 S.Ct. 1611, 56 L.Ed.2d 62 (1978):

> ▉ The general rule is that seized property, other than contraband, should be returned to its rightful owner once criminal proceedings have terminated.
>
> . . . the interests of judicial efficiency dictate that the problem should be resolved by the criminal trial court.[19]

And in *United States v. Palmer,* 565 F.2d 1063, 1065 (9th Cir. 1977), the Ninth Circuit ordered the district court to return to appellant, after his conviction for bank robbery, $763 seized from him at the time of his arrest. The court stated:

> We conclude that in absence of any cognizable claim of ownership or right to possession adverse to that of appellant, the district court should have granted appellant's motion and returned to him the money taken from him by government seizure.[20]

In short, these cases settled the law that a federal district court has post-conviction jurisdiction on motion to order the return of property lawfully seized pursuant to a federal warrant.[21]

▉ The Government argues, however, that *Wilson* "is not dispositive here."[22] The property clerk statute, D.C.Code §§ 4–151 et seq., is a local District of Columbia law of ancient lineage[23] which was

---

**17.** 176 U.S.App.D.C. at 324, 540 F.2d at 1103. Later in the opinion, the court stated that "once an item of property is no longer pertinent to a criminal prosecution, the item may be returned on application to the same criminal court." *Id.* 176 U.S.App.D.C. at 325 n.5, 540 F.2d at 1104 n.5. *See also id.* 176 U.S.App.D.C. at 322, 540 F.2d at 1101.

**18.** 584 F.2d at 1304. The money, about $12,-000, was seized from appellant Margolis during a lawful search for gambling contraband. Appellant filed a motion for return of the money, which he claimed was being unreasonably detained in light of the government's failure to file charges against him. (By the time the case was decided by the Third Circuit, charges had not been filed for over a year and a half.) The district court denied the motion. The Court of Appeals reversed and remanded for a determination on whether the government's retention of the money was reasonable. The Court expressed no doubt regarding its jurisdiction. *See* 584 F.2d at 1299 n.3 & 1302.

**19.** LaFatch was acquitted of extortion. After the trial, he moved for return of the money ($50,000) that he had allegedly received as a result of his extortion scheme. (The money was paid while the crime was in progress to LaFatch in collaboration with the F.B.I., which was investigating him). The district court ordered the money returned, believing that La-

Fatch's acquittal was *res judicata.* The court of appeals reversed, holding that the acquittal did not establish that LaFatch was the "rightful owner of the money." 565 F.2d at 84. The case was remanded, and the district court was "directed to make a determination, supported by findings of fact, as to which claimant is the rightful owner of the $50,000." *Id.* at 85.

**20.** Palmer was convicted of bank robbery. After the trial he sought to recover $763 in cash that had been seized at the time of his arrest. The district court refused. The court of appeals reversed and ordered the money returned, citing *Wilson* as authority establishing the district court's jurisdiction.

**21.** *See United States v. Chapman,* 559 F.2d 402, 405 (5th Cir. 1977); *In re Brenner,* 6 F.2d 425, 426–27 (2d Cir. 1925); *United States v. Ortega,* 450 F.Supp. 211, 212 (S.D.N.Y.1978).

**22.** Gov't Br. 11.

**23.** During the Civil War Congress created the Metropolitan Police District of the District of Columbia and established the Police therefor. Act of August 6, 1861, 12 Stat. 353. The next year Congress added the first provisions establishing the "property clerk" and directing him to take "custody" of property or money alleged to have been feloniously obtained, or otherwise

enacted during the Civil War and has not been amended since the jurisdiction of the United States Courts in the District of Columbia as to local crimes was greatly restricted by the Court Reorganization Act.[24] The property clerk statute was never intended to deprive local courts, much less the United States District Court, of any of its substantive or ancillary jurisdiction. As Congress indicated, the intent of the statute was merely to authorize the property clerk to return property, and to protect him from damage liability when he mistakenly returns property to the wrong person. The House Committee Report that accompanied the 1941 amendments to the statute explained:

> The purpose of the proposed bill is to amend sections 412 and 413 of the Revised Statutes of the District of Columbia (secs. 506 and 507, title 20, D.C.Code of 1929) [now 4–155, 156] so as to permit the property clerk of the Police Department of the District of Columbia to return, *without liability,* to the person who he determines to be the owner, property which has come into his possession as the proceeds of crime. Under the law as it now exists the property clerk is authorized to deliver property other than "the proceeds of crime" to the person who he determines to be entitled thereto. Where the property comes into his possession as the proceeds of crime, he, in determining ownership, is not protected by the statute but is liable in damages for conversion of the property in the event he, by mistake, delivers the property to one claimant when another claimant, of whose claim he has knowledge, is the actual owner. Therefore, under the existing law, when the property clerk is holding money or property which has come into his possession as the proceeds of crime *and is confronted by the adverse claims of two or more persons,* he, in order to protect himself, must require a person claiming to be

the owner either to obtain an order of court directing the delivery of the property to him, or to give a bond to indemnify the property clerk against any loss or damage, or to secure a release or releases from the other adverse claimant or claimants. *This has resulted on many occasions in the true owner of the property being put to unnecessary trouble and expense.* This trouble and expense will be obviated by the proposed bill. Of course, *the authority given the property clerk to determine ownership does not settle the question of title as between the parties.* It merely protects the property clerk from suit in the event of a mistake. *If a mistake is made it may be rectified by a suit between the parties to determine ownership.*

H.Rep.No.377, 77th Cong., 1st Sess. (1941) (emphasis added).

In *Carroll v. Heidenheimer, Inc.,* 44 A.2d 71 (D.C.App.1945), the court in an opinion by Associate Judge Hood rejected the argument that the property clerk's jurisdiction to return property is exclusive, relying in part on this legislative history. In *Heidenheimer,* the property clerk awarded the property in question (a diamond) to appellant. Appellee then filed suit, and the court reversed the property clerk and held that appellee was entitled to the diamond. On appeal, appellant argued that the property clerk's determination was binding. The appellate panel disagreed:

> Congress did not intend by this amendment to oust the courts of jurisdiction to try title to personal property coming into the hands of the police department or its property clerk.

44 A.2d at 72. It would be fanciful to interpret a statute designed to protect a police property clerk in his exercise of a purely local administrative function as restricting the ancillary jurisdiction of United States Courts, especially when its decision is not binding on the local court.

---

lost or abandoned. Act of July 16, 1862, 12 Stat. 578. The next amendment was 14 Stat. 213 and then came codification. 18 Stat. 48 et seq. Subsequent amendments are found at 55 Stat. 185 and 76 Stat. 589.

**24.** D.C.Code § 11–101 et seq.

Nevertheless the Government asserts that 4 D.C.Code § 4–157 explicitly precludes any jurisdiction in the United States Courts to order return of the property, and that *Wilson* should not be read as conferring jurisdiction on the district court in contravention of a "specific statutory denial of power. . . ."[25]

Section 157 provides:

Whenever property or money shall be taken from persons arrested, and shall be alleged to have been feloniously obtained, or to be the proceeds of crime, and whenever so brought with such claimant and the person arrested before any court for trial, and the court shall be satisfied from evidence that the person arrested is innocent of the offense alleged, and that the property rightfully belongs to him, said court may, in writing, order such property or money to be returned, and the property clerk, if he have it, to deliver such property or money to the accused person himself, and not to any attorney, agent, or clerk of such accused person.

The Government asserts that by specifying cases in which the accused is acquitted, Congress implicitly removed jurisdiction from the United States Courts in all other cases. Thus, according to the Government, unless the defendant is acquitted, he must go to the property clerk in order to retrieve confiscated property.[26]

The short answer to this argument is that D.C.Code § 157 was applicable in *Wilson.* If the Government's interpretation of that section were correct, then it would have been just as inappropriate to order return of the money there as it supposedly is here. Thus, *Wilson* implicitly rejects the Government's interpretation of section 157.[27]

The long answer to the Government's argument is that section 157 does not limit federal jurisdiction to cases in which the defendant was acquitted. The statutory grant of jurisdiction whenever the defendant was acquitted does not necessarily mean that such jurisdiction is exclusive. Moreover, the legislative history of the property clerk statute tends to undercut the Government's position. *See* pp. ―― ―― of 197 U.S.App.D.C., pp. 935–936 of 610 F.2d *supra.*

Another feature of the history of the property clerk statute is also inconsistent with the Government's contention. As initially enacted the statute provided:

If any property or money placed in the custody of the property clerk shall be desired as evidence in any police or other criminal court, such property shall be delivered to any officer who shall present an order to that effect from such court; such property, however, shall not be retained in said court, but shall be returned to said property clerk to be disposed of according to the provisions of this act.[28]

This provision, which would tend to support the argument that the property clerk's jurisdiction to return seized property is exclusive, was excluded from the 1873 revision and codification of the District of Columbia Code 18 Stat., Part 2, 48, and is no longer part of the statute. Moreover it shows that the authority of the property clerk with respect to the *res* results from the jurisdiction of the District Court to authorize the search and seizure of contraband, evidence of crime, etc. In light of its legislative history, section 157 is hardly the "specific statutory denial of power" that was referred to in *Morrow v. District of Columbia, supra.*[29]

---

**25.** Gov't Br. 10, *quoting Morrow v. District of Columbia,* 135 U.S.App.D.C. 160, 169, 417 F.2d 728, 737 (D.C. Cir. 1969). In *Morrow,* the court stated: "all courts, absent some specific statutory denial of power, possess ancillary powers to effectuate their jurisdiction."

**26.** D.C.Code § 4–156 establishes procedures for the return of property by the property clerk.

**27.** Wilson pleaded guilty. If section 157 limited federal jurisdiction to cases in which the defendant was acquitted, then obviously it would have been improper to order the district court to return Wilson's money.

**28.** 12 Stat. 578, 579 (1862).

**29.** See note 25 and accompanying text.

Finally, even if we agree with the Government that the property clerk statute was designed to restrict federal jurisdiction, the district court clearly had jurisdiction here. Section 157 explicitly grants jurisdiction to the district court when "the court [is] . . . satisfied from evidence that the person arrested is innocent of the offense alleged . . . ." It would be senseless to interpret this section as authorizing the return of property when a defendant is acquitted after a trial, but not when the charge is dismissed before trial on motion of the U.S. Attorney because, as asserted by defense counsel in open court, the government "did not have . . . sufficient evidence to go forward . . . ." Tr. April 19, 1977, 6.

■ In summary, we reject the Government's contention that the district court lacks jurisdiction to order return of appellants' money. The existence of such jurisdiction was clearly held in *United States v. Wilson,* despite D.C.Code § 4–157. Properly construed D.C.Code §§ 4–151 et seq. does not restrict the general jurisdiction of federal courts [30] and as we state above, even accepting the Government's erroneous interpretation of section 157, the district court under that statute has jurisdiction to order the property returned in this case.

## B

■ The Government also contends that since the money in question is held by the District of Columbia, which is not a party to this criminal action, the district court lacks personal jurisdiction to order the money returned.[31] The short answer to this argument is that whoever holds the money does so as agent for, and subject to the ultimate direction of the United States District Court for the District of Columbia, under the authority of whose process the money was seized.[32]

The money was obtained on a search warrant requested from and issued out of the United States District Court by the United States Magistrate,[33] and pursuant to that warrant the seized narcotics, paraphernalia and money were in effect acknowledged to be subject to the jurisdiction of the United States District Court by the written inventory filed by the officer who had requested the search warrant and led the search and seizure.[34] Subsequently, Wright and Boyd were charged in two indictments returned by the Grand Jury in the United States District Court on charges based on the property seized pursuant to the aforesaid search warrant. Under such circumstances, it is the United States District Court that has primary jurisdiction over the money and property seized pursuant to its warrant and upon which it issued its indictment because pursuant to law it issued its warrant authorizing and directing the search and seizure and requiring the seizing officer to "prepare a written inventory . . . . and *bring the property before me as required by law.*" If the District of Columbia

---

30. *See McClendon v. Rosetti,* 460 F.2d 111 (2d Cir. 1972) (New York City property clerk ordinance held "fatally deficient in . . . terms of due process" because it places the burden of proof on a claimant to "establish that he has a lawful title or property right in such property or money and lawfully obtained possession thereof and that such property or money was held and used in a lawful manner" (460 F.2d at 115) even though "such money or property was not related to any criminal proceeding, or, if it was so related, such criminal proceedings had been terminated, or if the money or property had been needed as evidence in a criminal proceeding, it was no longer needed for that purpose . . . ." (460 F.2d at 116)).

31. Gov't Br. 12.

32. *Wilson, supra,* which establishes that the district court has subject matter jurisdiction to order the return of seized property is also controlling on the personal jurisdiction issue. In *Wilson,* the money was held by the property clerk for about a year, and then was deposited into the general revenue fund of the District of Columbia. Despite this, the court held that the district court should order the money returned, stating: "[w]hoever holds the money holds it subject to the order of the federal court and is subject to its judgment and the execution thereof." 176 U.S.App.D.C. at 325, 540 F.2d at 1104.

33. *See* n. 1, *supra.*

34. *See* n. 2, *supra.*

or the property clerk have somehow come into the possession of such money or property they hold it as agents subject to the order of the United States Courts.

## III

Having determined that the district court has jurisdiction to order the money returned, the remaining issue is whether the court properly refused to do so. A rule often expressed is that such property should be returned provided that it is not "[1] stolen, [2] contraband, or [3] otherwise forfeitable, and [4] which is not needed, or is no longer needed, as evidence." [35]

## A

■ The Government asserts that appellants have an obligation to prove that they

are entitled to the money.[36] We do not believe, however, that the mere fact of seizure requires that entitlement be established anew. The seizure of property *from someone* is *prima facie* evidence of that person's entitlement, particularly when the seized property is money [37]—negotiable instruments difficult to identify and trace. The whole thrust of the cases that we have cited is that when property is seized from a person, the court must return it to that person when it is no longer needed by the government.[38] The court is obligated to restore the *status quo ante.* Unless there are serious reasons (presented by the government or adverse claimants) to doubt a person's right to the property seized from him, he need not come forward with additional evidence of ownership.[39]

**35.** *Wilson, supra,* 176 U.S.App.D.C. at 322, 540 F.2d at 1101.

**36.** It contends that appellants should be treated like any civil plaintiff who is trying to establish title to property. Gov't Br. 21. While we believe that appellants have made a *prima facie* case for entitlement under that standard, *see* text accompanying note 40 *infra,* we disagree with the breadth of the government's assertion.

**37.** *Northern Pacific Co. v. Lewis,* 162 U.S. 366, 372, 16 S.Ct. 831, 833, 40 L.Ed. 1002 (1896) ("possession is *prima facie* evidence of some kind of rightful ownership or title."). *See Lantz International Corp. v. Industria Termotecnica Compania, S.p.A.,* 358 F.Supp. 510, 516 (M.D.Pa.1973); *Mid-State Homes, Inc. v. Hockenbarger,* 192 Kan. 505, 389 P.2d 760, 765 (1964); *Affiliated Distillers Brands Corp. v. Gold Seal Liquors, Inc.,* 13 Ill.App.2d 249, 141 N.E.2d 659 (1957) (only published headnotes).

**38.** *E. g., United States v. Palmer, supra, quoted in* text accompanying note 20; *Wilson, supra,* 176 U.S.App.D.C. at 322, 540 F.2d at 1101.

**39.** *United States v. LaFatch, supra* at note 19, is a case in which "serious doubts" were raised about a claimant's entitlement to money seized from him. In *LaFatch,* the claimant's right to the money was contested by the corporation that had given him the money in the first place. It was prepared to prove that the money was paid to LaFatch as a result of his extortion scheme. In that context the district court was directed to determine "which claimant is the rightful owner of the $50,000." 565 F.2d at 85. But in *United States v. Palmer, supra,* 565 F.2d at 1064–65 (emphasis added) (footnote deleted), where there were no adverse claimants,

the seized money was ordered returned. The court stated:

> The government makes no claim of ownership by virtue of forfeiture or otherwise. There was no evidence that the money was the property of the bank, although the government in brief and argument persists in referring to it as "bank loot." *The bank that was the victim of the robbery made no third-party claim of ownership. Nor has it perfected any claim against the money as security for a civil judgment being sought in another forum.*
>
> *Thus, no dispute as to ownership has been tendered to the court for resolution* or interpleader. The guilty verdict did not, of course, carry with it any civil adjudication of liability to the victim bank in any specified amount. The only claim adverse to that of the defendant was the government's claim that as a short-cut to an obviously just solution it should be permitted to turn the money over to the victim bank and let defendant try to get it back from the bank.
>
> While we wholeheartedly approve the proposition that victims of crime should have compensation from the criminal, we feel that even at the cost of judicial time it is preferable to accomplish this end through traditional judicial procedures rather than to leave it to the police, state or federal, to find nonjudicial ways and means by which to secure compensation from the criminal. Accordingly, we reject any claim of the United States to possession of the money for such purpose.
>
> One successful method when a bank robber, for instance, turns up with money that cannot be positively identified is for the bank or insurance company to bring suit charging the theft of the money and simultaneously gar-

■ Here, the Government concedes that $1,500 was taken from the person of appellant Wright. The $600 is in a somewhat different posture. The only evidence introduced indicates that both Wright and Boyd "stayed" in and "used" the room where the money was found. The Government contends that such evidence is not sufficient to prove Wright and Boyd's entitlement to the money. But then in substantial contradiction to its contention with respect to the money, the Government asserts that the narcotics and narcotics paraphernalia found in the same room as the money should be charged against appellants to color the money. The Government cannot sustain such adverse positions on the same evidence. In the absence of other proof, and despite the dismissal of the narcotics charges on other grounds, the evidence to date indicates that the money is properly attributed to Wright and Boyd. In short, while appellants' possession of the $600 found in the room they "used" is less certain than Wright's possession of the $1,500 seized from her person, we believe that appellants' claim to the $600 is sufficient to warrant a response by the Government if they have any evidence of different ownership.[40] Therefore, it was incumbent on the Government to come forward with evidence calling into question appellants' "ownership

or right to possession."[41] As we explain below, thus far the Government has not satisfied this burden.

### B

The district court held that appellants were not "owners of [the] money found in the house."[42] The Government argues, in addition, that the "money was indeed the proceeds of heroin distribution."[43] We hold that the evidence before the district court justifies neither of these conclusions with respect to the $2,100 here involved, and therefore it was clearly erroneous to hold that appellants' entitlement has not been established.

As evidence against appellants' claim of ownership, the district court relied heavily on statements appellants made in affidavits in order to qualify for appointed counsel under the Criminal Justice Act.[44] The court's reasoning appears to be that since appellants swore they could not afford to retain counsel, then, they must not have owned the money that was seized from them. Such conclusion does not logically follow. The Government is entitled to retain seized property for the duration of the trial, provided that the property is needed as evidence.[45] If the property is found to be contraband, then the Government need

---

nishe or attach the money, or use similar local process.

**40.** The Government argues that many of the residents of the building at 1341 T Street, N.W., had access to the dresser in which the money was found, and that "the building had been occupied by so many short-term residents that it is impossible to tell just who lived in the building on October 8, 1976." Gov't Br. 20. Nevertheless, only appellants have claimed the money. Under these circumstances, the Government must respond with some evidence of a "cognizable claim of ownership or right to possession adverse to that of appellant[s] . . . ." *United States v. Palmer, supra,* 565 F.2d at 1065. Of course, it would be easier for the Government to rebut appellants' claim to the $600 than to rebut Wright's claim to the $1500 seized from her person. But the weakness of appellants' claim does not entirely re-

lieve the Government of its obligation to respond.

**41.** *Palmer, supra,* 565 F.2d at 1065.

**42.** Tr. 26.

**43.** Gov't Br. 22.

**44.** The transcript includes the following statements by the court: [A]ffidavits were submitted indicating that these defendants were indigent and then counsel were appointed." Tr. 22. "These parties . . . have sworn to statements as to their indigency at that time." Tr. 22. "As I pointed out earlier, they both claimed that they had no funds and accordingly attorneys were appointed under the Criminal Justice Act." Tr. 25.

**45.** *E. g., Wilson, supra,* 176 U.S.App.D.C. at 322, 540 F.2d at 1101; *LaFatch, supra,* 565 F.2d at 83.

not return it at all.[46] Realistically, therefore, a defense attorney could not expect to recover his fee from the impounded funds. Thus, appellants' statements that they lacked the funds to retain an attorney, when they had just been denuded of all cash the officers could find on their person or in the premises where they lived, is not inconsistent with their claim to the confiscated money. Appellants merely attested that they lacked money to retain counsel at the time they requested the court to appoint counsel.[47] The fact that $2,100 had been seized from them does not disprove their statement—in fact, it tends to support it.

The district court also referred to the "substantial amount of money and large amounts of narcotics found in the premises . . . where these two ladies were arrested. . . ."[48] Appellants' *prima facie* showing of entitlement to the money is not rebutted merely because narcotics and other money were found on the premises. And we cannot rely on the Government's

reference in its brief to facts outside the record[49] to establish that appellants are not entitled to the money. We also note that Raymond Burrell has not come forward with any claim to any of the money.

Finally, the Government contends that appellants are not entitled to the money because it is the proceeds of narcotics distribution.[50] To support this argument, the Government notes that (1) appellants reside in a "[narcotics] shooting gallery,"[51] (2) they later pleaded guilty to other drug charges arising out of a search of their residence that occurred after the money was seized,[52] and (3) they had been unemployed for years previous to their arrests. We are not persuaded that these facts, alone or in conjunction, establish that the money is the proceeds of crime.[53] There are a great many women of whom it might be said that they are unemployed but who legally possess money. Neither appellants' place of residence nor their subsequent guilty pleas to drug charges based on *later offenses* establishes that the money previ-

---

**46.** *United States v. Jeffers,* 342 U.S. 48, 52, 72 S.Ct. 93, 96 L.Ed. 59 (1951); *Trupiano v. United States,* 334 U.S. 699, 701, 68 S.Ct. 1229, 92 L.Ed. 1663 (1948); *LaFatch, supra,* 565 F.2d at 83; *In re Wiltron Associates, Ltd.,* 49 F.R.D. 170, 173 (S.D.N.Y.1970). Of course, "if the Government seeks to forfeit the property a proper proceeding should be instigated to accomplish that purpose." *Wilson, supra,* 176 U.S.App.D.C. at 325, 540 F.2d at 1104.

**47.** If the district court's reasoning were accepted, then an indigent defendant would almost never be able to reclaim property seized from him. One should not have to forfeit all of his property in order to qualify for court appointed counsel.

**48.** Tr. 25.

**49.** Gov't Br. 18–19.

**50.** We assume, arguendo, that appellants would not be entitled to the return of money if it were the proceeds of crime.

**51.** *See, e. g., United States v. Johnson,* 154 U.S.App.D.C. 393, 397, 475 F.2d 977, 981 (D.C. Cir. 1973) (dissent per Bazelon) (a "shooting gallery" is "a place used exclusively for the injections of narcotics."); *United States v. Girst,* No. 77–1604 (D.C. Cir. decided March 28, 1978); *United States v. Branch,* 178 U.S.

App.D.C. 99, 107, 545 F.2d 177, 185 (D.C. Cir. 1976).

**52.** The premises at 1341 T Street, Northwest, were subject to a number of searches. During a search on March 1, 1977, four months after the appellants' money was seized, the police confiscated heroin, narcotics paraphernalia and handguns. Gov't Br. 5. As a result of the March 1, 1977 search, appellants were arrested, and each pleaded guilty to one count of possession of implements of a crime (D.C. Code § 22–3601). Other persons arrested on March 1, were tried and convicted of more serious drug charges. *See United States v. Dorsey,* 192 U.S.App.D.C. 313, 591 F.2d 922 (D.C. Cir. 1978).

**53.** The original intent of Congress in 1862 when they spoke of the "proceeds of crime" undoubtedly had reference to property that had been stolen, burglarized, embezzled or taken by theft. And the issue in such cases involved the rightful owner of the property as several might claim ownership. To convert "proceeds of crime" to *profits* of crime in the new lexicon of crimes that have grown up with the sales of narcotics running into the millions of dollars is to place a new connotation on a term that was probably not within its original connotation and to raise a myriad of questions.

ously seized from them was the fruit of narcotics sales. And certainly appellants' unemployment, a status shared by many law abiding citizens, does not prove that the money was the proceeds of crime.

The salient fact is that the district court dismissed all charges against appellants arising from the search and seizure involved in this case. There is not one shred of evidence in the record that the money seized was obtained from heroin sales. Moreover, the Government concedes that "the District Court did not have occasion to rule on this issue." [54] Thus we cannot accept the Government's contention that the money should not be returned to appellants because it is the proceeds of crime.

In summary, the Government argues that Wright and Boyd have not proved their entitlement to the money by a preponderance of the evidence. It is obvious that Detective Budai's testimony was not massive but, taken together with the inventory on the search warrant, it was the *only evidence* and it supported appellant's claim of entitlement. The burden of proceeding at the hearing then shifted to the Government and it has not introduced any evidence to overcome the facts from which a presumption of entitlement flows. Recognizing the deficiency of its case after Wright and Boyd filed their appeal, the Government then supplemented the record with transcripts and documents relating to acts and offenses that occurred considerably after the events that are discussed above. We have examined the supplemental record and besides being generally incompetent, irrelevant, and immaterial, it in no way changes the facts on which this case must be decided. The district court's decision, therefore, must be vacated.

## IV

While the Government has not yet rebutted appellants' claim of entitlement, we are reluctant to order the money returned at this stage of the proceedings. At the outset of the hearing on appellants' motion for return of the seized money, the Government indicated that it "would put on the evidence as to why they should not get [the money] back." [55] Since the district court held, before any evidence by the Government, that appellants had not presented a *prima facie* case for ownership, the Government had no opportunity to present this evidence. In short, the Government has had no opportunity to introduce its evidence, and the record is incomplete in that respect.

We remand this case to the district court. The district court has jurisdiction to order the money returned to appellants, and we are satisfied that the seizure of the money from appellants constitutes a *prima facie* showing of entitlement. But the Government and any other claimant should be permitted to introduce competent evidence that contradicts appellants' claim.

One final point. We have noted the court's statement that if Wright and Boyd obtain the $2,100 the Government should be recompensed for the $1,835 that it paid out of funds appropriated for defense counsel, acting pursuant to the Criminal Justice Act. We do not discuss the issues that such a claim raises, except that it is an issue the trial court may consider and rule on if the Government puts in any such claim.

*Judgment accordingly.*

**54.** Gov't Br. 22 n.15.

**55.** Tr. 4.