COUNTY OF HENRICO

v.

GEORGE EHLERS

Record No. 861174

COMMONWEALTH OF VIRGINIA

v.

GEORGE EHLERS

Record No. 861181

NATIONAL RAILROAD PASSENGER CORPORATION

v.

GEORGE EHLERS

Record No. 861182

April 21, 1989

Present: All the Justices

*Joseph P. Rapisarda, Jr., County Attorney (Bruce A. Kimble, Assistant County Attorney,* on brief), for appellant. (Record No. 861174)

*Michael H. Gladson (Francis E. Telegadas; Mays & Valentine,* on brief), for appellee. (Record No. 861174)

*Joseph P. Rapisarda, Jr., County Attorney (Mary Sue Terry, Attorney General; Mary Yancey Spencer, Senior Assistant Attorney General; W. Mark Dunn, Assistant Attorney General,* on brief), for appellant. (Record No. 861181)

*Michael H. Gladstone (Francis E. Telegadas; Mays & Valentine,* on brief), for appellee. (Record No. 861181)

*Joseph P. Rapisarda, Jr., County Attorney (Christopher M. Klein, Deputy General Counsel; David J. Carol, Assistant General Counsel,* on brief), for appellant. (Record No. 861182)

*Michael H. Gladstone (Francis E. Telegadas; Mays & Valentine,* on brief), for appellee. (Record No. 861182)

THOMAS, J., delivered the opinion of the Court.

These appeals arise from a single statutory interpleader action instituted by Henrico County (the County), pursuant to Code § 8.01-364. The interpleaded stake consisted of $128,464.04 in U.S. currency which County police officers seized after arresting two passengers on an Amtrak train on suspicion of possessing illegal drugs. The County, the National Railroad Passenger Corpora-

tion (Amtrak), and George Ehlers, one of the arrestees, all claimed the money.

The issue is whether certain statements made by Ehlers while in police custody, in which he denied knowledge or ownership of the money, were improperly excluded from consideration by the trial court in determining which, if any, of the claimants were entitled to the interpleaded money. For the reasons set forth below, we conclude that the statements should not have been excluded. Therefore, we will reverse the judgment appealed from.

## I. *FACTS*

On August 27, 1983, George Ehlers and his son boarded an Amtrak train in Miami, Florida, bound for New York. Because the men fit a "drug courier profile," they were kept under observation by Amtrak officials who were aware of the sleeping compartment assigned to them.

A special team of County police, known as an Amtrak interdiction team, was put on alert to board the train when it stopped in the County at the Staples Mill Road Amtrak station. The train arrived about 3:40 a.m. on August 28, 1983. County police boarded the train with a dog trained to locate certain drugs by scent. The dog was taken past the door to the compartment occupied by the men. The dog "alerted" by biting and scratching on the door.

The County police officers knocked on the door, awakened the men, advised them that the dog had alerted on their compartment, and directed them to step into the hallway with their luggage. The dog then alerted on certain pieces of luggage. Based on this, the men were handcuffed, taken into custody, and transported to the County public safety building; their luggage was seized.

At the police station, the men were placed in separate locked interrogation rooms. George Ehlers was given his *Miranda* warnings. He was also advised that the police intended to search his luggage; the police explained further that they could search with his consent or else secure a search warrant. Ehlers refused to consent to a search. Further, he invoked his right to counsel pursuant to *Miranda*. However, he was never given access to counsel.

The police secured a search warrant and searched the luggage about 8:45 a.m. They found large sums of money in two of the pieces of luggage. The money was in denominations of five, ten, twenty, and hundred dollar bills, secured by rubber bands and

stacked in rows on top of each other. It was later determined that the money totaled $255,654.04. The search also revealed a money belt containing about $500. The search did not reveal any drugs that were visible to the eye. However, when the luggage was examined at the State crime laboratory, two of the pieces of luggage were found to contain marijuana residue.

After the search revealed the money, the police officers returned to the interrogation room and initiated further conversation with Ehlers, despite the fact that he had already invoked his right to counsel. Ehlers was not given a second set of *Miranda* warnings. According to the police, an officer walked into the room and commented that "that was a large sum of money to be carrying around." Ehlers replied, "$500 is not a lot of money." The officer responded, "I'm not talking about $500; I'm talking about a whole lot more money than that." According to the officer, Ehlers replied he did not know what the officer was talking about. The officer then asked Ehlers "at least three times" whether Ehlers was saying that the money did not belong to him. According to the officer, Ehlers replied that the only money he had was the $500 in the money belt. The officer then asked Ehlers whether the money belonged to his son. Ehlers replied that he could not imagine what his son would be doing with that kind of money.

Based on Ehlers' statements, County police notified Internal Revenue Service (IRS) agents under a standing policy to advise the IRS any time the police discovered money in excess of $10,000 which no one claimed. The IRS immediately served a notice of levy and attachment in the amount of $127,190; this amount was seized by the IRS leaving $128,464.04 in the hands of the County.*

About 9:00 a.m. on August 28, 1983, the men were released from custody. The police retained the luggage and the money. According to the police, when the men were released, Ehlers did not ask for the return of the money nor did he mention it in any way. No criminal charges were ever filed by the Commonwealth against either man.

On September 8, 1983, the County filed the interpleader action out of which these appeals arise. The County alleged that after

---

* The IRS had intended to seize fifty percent of the $255,654.04 found in the luggage. The amount actually seized was slightly less than fifty percent. Later, the IRS sent George Ehlers a notice of assessment in which it demanded a sufficient amount of money to make up the difference. Ehlers paid the difference to the IRS.

the money was discovered, no person claimed ownership thereof and that Ehlers, who was "found in proximity to the luggage" which contained the money, "denied knowledge of or ownership of the money." The County alleged further that Amtrak, the County Division of Police, and the Commonwealth of Virginia all had claimed an interest in the money and that there was "no readily ascertainable means by which to determine ownership of the $128,464.04."

On September 21, 1983, Amtrak filed its claim for the money on the ground that the money had been "abandoned, lost or misplaced on its passenger train." On September 23, 1983, the Commonwealth asserted its claim to the money on the ground that it was "unclaimed property" under Virginia law and thus should be held by the Commonwealth until validly claimed "by the true owner." On September 30, 1983, the County claimed the money on the ground that it had seized the money pursuant to a search warrant. Finally, on November 14, 1983, George Ehlers claimed the money on the ground that it was "part of what was found in [his] actual or constructive possession . . . on August 28, 1983."

The matter came on for a trial on May 20, 1986, at which time a jury was empaneled and testimony was taken. That proceeding ended in a mistrial on May 22, 1986. The matter came on again for a hearing on June 25, 1986. This time no jury was empaneled. The parties agreed that the evidence adduced in the May hearing was sufficient for the trial court to dispose of the case and that no further evidence was necessary. The transcript of the May proceeding was made part of the record for the trial court's consideration. The trial court then heard argument of counsel.

On June 27, 1986, the trial court issued a letter opinion which was incorporated by reference into the final order in this case. In the letter opinion, the trial court stated the issue as follows:

whether the statements obtained from [George Ehlers] by the officers and agents of the adverse claimants, Henrico County, Amtrak and the Commonwealth of Virginia, in violation of his constitutional rights, are inadmissible in this civil interpleader action because their use would violate the constitutional policy of deterrence and allow proof of a substantive issue by legally non-probative evidence.

The trial court, on the basis of *Romanelli* v. *Commissioner of Internal Revenue*, 466 F.2d 872 (7th Cir. 1972), and "analogous Fourth Amendment cases" ruled that Ehlers' statements should be excluded.

Having excluded Ehlers' statements from consideration, the trial court then ruled that there was no evidence to support the contention that Ehlers had abandoned the money. Therefore, the trial court concluded that because the money had been in Ehlers' possession when it was seized, he was entitled to its return. The effect of the order was suspended pending this appeal.

## II. *DISCUSSION*

In framing the issue whether Ehlers' custodial statements could be used in a civil proceeding, the trial court asserted that the statements were elicited "in violation of Ehlers' constitutional rights." The trial court also stated that the statements would be "inadmissible in a criminal case." Next, the trial court stated that in resolving the issue, it was required to "weigh the deterrent benefit of the exclusion against the detriment to the public interest in providing fact finders with all relevant testimony." In making this statement, the trial court did not explain how the Fourth Amendment exclusionary rule could come into play in a civil case in which there never was a complaint about search and seizure.

Ultimately, the trial court stated that Ehlers' Fifth Amendment rights were violated; it wrote as follows:

This Court is of the opinion that *Romanelli*, . . . and the analogous Fourth Amendment cases make it clear that evidence obtained by a violation of a citizen's Fifth Amendment right should be excluded in a subsequent civil proceeding where the government entity responsible for the constitutional violation participates and would profit by its admissibility.

Next, in order to explain the use, in a civil proceeding, of rules which normally apply in criminal proceedings, the trial court invoked "judicial integrity." The trial court wrote as follows: "In order to preserve the policy of deterrence of constitutional violations and judicial integrity, the statements of Ehlers obtained by the adverse claimants, Henrico, Amtrak and the Commonwealth, will be excluded."

## A. *VIOLATIONS OF EHLERS' RIGHTS*

### 1. *Constitutional Violations*

■ We disagree with the trial court's threshold assertion that Ehlers' constitutional rights were violated. Although the trial court used the Fourth Amendment exclusionary rule by analogy, this appeal has nothing whatever to do with the Fourth Amendment. Ehlers has never contended that the County police officers committed any illegal searches or made any illegal seizures. In short, no violation of the Fourth Amendment has ever been alleged and we perceive none.

■ Nor were Ehlers' Fifth Amendment rights violated. The Fifth Amendment provides in pertinent part as follows: "No person shall be . . . compelled in any criminal case to be a witness against himself." By its own terms, the Fifth Amendment operates only in criminal cases. Moreover, the Fifth Amendment is not violated until compelled testimony is used against a person in a criminal case. *See Allen* v. *Illinois*, 478 U.S. 364 (1986).

But a civil interpleader action is not a criminal proceeding. It does not have as one of its purposes meting out punishment for the violation of the criminal laws. Indeed, Ehlers makes no effort to characterize, as criminal, the proceeding on which this appeal is based. On brief, Ehlers makes no attempt to explain how his Fifth Amendment rights were violated. Nor was an explanation provided during oral argument.

We conclude from the record that there was no Fifth Amendment violation in this case. Therefore, the trial court improperly concluded that a Fifth Amendment violation had occurred and, thus, needed to be remedied. Because there were no constitutional violations in this case, the major premise upon which the trial court ordered relief was unfounded.

### 2. Miranda *Violation*

■ The wrongdoing here was that the police officers did not scrupulously honor Ehlers' request for counsel. *Miranda* v. *Arizona*, 384 U.S. 436 (1966), was doubtless violated. But *Miranda* does not have independent force; it does not confer constitutional rights; it provides a remedy for the vindication of Fifth Amendment rights by creating what amounts to a conclusive presumption that any statement made during custodial interrogation without the benefit of *Miranda* warnings, was involuntary.

■ Since there was no Fifth Amendment violation, the protection that would have been afforded by *Miranda* was never called into play. Nevertheless, the trial court excluded statements made by Ehlers because the County police had not complied with *Miranda*. Upon analysis, it is apparent that, because *Miranda* never came into play, the trial court should not have sought to punish for a *Miranda* violation by excluding Ehlers' statements.

### B. *THE TRIAL COURT'S USE OF FOURTH AMENDMENT PRINCIPLES BY ANALOGY*

The only constitutional violation asserted by the trial court concerned the Fifth Amendment. We have demonstrated that that constitutional provision was not violated. But even if it had been, it was nevertheless inappropriate for the trial court to apply Fourth Amendment principles by analogy to what, at best, was a Fifth Amendment problem.

The Fourth Amendment exclusionary rule was first announced by the Supreme Court in *Weeks* v. *United States*, 232 U.S. 383 (1914). It was applied to the States in *Mapp* v. *Ohio*, 367 U.S. 643 (1961). *Mapp* described the exclusionary rule as a judicially implied, yet constitutionally required, "deterrent safeguard without insistence upon which the Fourth Amendment would have been reduced to 'a form of words.' " *Id.* at 648, (quoting *Silverthorne Lumber Co.* v. *United States*, 251 U.S. 385, 392 (1920) (Holmes, J.)). In addition to deterrence, the *Mapp* Court also invoked the "imperative of judicial integrity" in support of the rule. 367 U.S. at 659 (quoting *Elkins* v. *United States*, 364 U.S. 206, 222 (1960)).

Since *Mapp*, the Supreme Court has made clear that the "imperative of judicial integrity" no longer serves as an independent supporting ground for the rule; it has merged into the deterrence ground which is now firmly established as the primary, if not sole reason, for the exclusionary rule. *See Stone* v. *Powell*, 428 U.S. 465 (1976); *United States* v. *Janis*, 428 U.S. 433 (1976); *United States* v. *Calandra*, 414 U.S. 338 (1974). In *Stone*, the Court wrote as follows about the imperative of judicial integrity:

> Although our decisions often have alluded to the "imperative of judicial integrity," . . . they demonstrate the limited role of this justification in the determination whether to apply the rule in a particular context. Logically extended this

justification would require that courts exclude unconstitutionally seized evidence despite lack of objection by the defendant, or even over his assent . . . . While courts, of course, must ever be concerned with preserving the integrity of the judicial process, this concern has limited force as a justification for the exclusion of highly probative evidence.

428 U.S. at 485 (citations and footnotes omitted). *Stone* also suggests that deterrence is the "sole rational justification" for the rule. *Id.* at 487 n. 24.

■ According to the Supreme Court, the exclusionary rule has never been applied in a civil proceeding, state or federal. *INS* v. *Lopez-Mendoza*, 468 U.S. 1032, 1042 (1984); *United States* v. *Janis*, 428 U.S. at 447. When that statement was first made in *Janis*, the Supreme Court left open the question whether the exclusionary rule might be applied in civil cases where the same sovereign which violated the Fourth Amendment would stand to benefit from that violation in the civil proceeding. The factual scenario left open in *Janis* was the very one considered in *Lopez-Mendoza*. Yet, in *Lopez-Mendoza*, the Supreme Court refused to apply the exclusionary rule to a civil deportation proceeding.

Even when the rule is applied in criminal cases, debate continues concerning its effectiveness. *Stone*, 428 U.S. at 492 n.32; *Janis*, 428 U.S. at 446; *Calandra*, 414 U.S. at 348 n.5. There exists no empirical proof of the exclusionary rule's effectiveness.

The Supreme Court itself admits that even where the exclusionary rule is applied in criminal cases, it operates at substantial costs to society. It makes reliable and probative evidence unavailable; it deflects the truthfinding process; it risks engendering disrespect for law by promoting procedure above the fundamental search for truth and justice. *Stone*, 428 U.S. at 490-91. *See Janis*, 428 U.S. at 447-48.

Further, the Fourth Amendment and the Fifth Amendment operate in distinctly different ways. The Fifth Amendment, as pointed out above, is not violated until there is an attempt to use compelled testimony at a criminal proceeding. Thus, Fifth Amendment rights can generally be protected "on the spot," at the moment the violation is attempted by making a timely objection. On the other hand, the Fourth Amendment is violated the moment there is an unreasonable search and seizure. *Calandra*, 414 U.S. at 354. Thus, by the time a criminal matter comes

before a court for a hearing, the Fourth Amendment violation has already occurred. If there was no mechanism to deter such conduct, *in the future*, there would be no effective way to protect the rights preserved by the Fourth Amendment. The Fourth Amendment exclusionary rule is intended to provide generalized pressure on police to cause a future adherence to Fourth Amendment requirements.

From the foregoing compilation of Supreme Court statements concerning the Fourth Amendment exclusionary rule, it is apparent that even when the rule is applied to the core area of its concern, it is subject to debate, skepticism, and criticism. In light of this, it is our opinion that the Fourth Amendment exclusionary rule should not be extended from criminal cases to civil cases.

### C. *THE TRIAL COURT'S RELIANCE ON JUDICIAL INTEGRITY*

The trial court made reference to "judicial integrity" as if it is an independent concept unrelated to the Fourth Amendment exclusionary rule and as if, by itself, the concept is a proper basis for excluding testimony. First, as shown above, "judicial integrity" is part of the Fourth Amendment exclusionary rule analysis. It was originally relied upon as a justification for the rule; it no longer serves that purpose. Now, under Supreme Court jurisprudence, upholding "judicial integrity" means nothing more than providing deterrence.

No court can or will say that it is not interested in upholding judicial integrity. But a court need not turn its back on that broad noble concept in order to state that the phrase provides no guidance in deciding when and where to apply the exclusionary rule. To invoke judicial integrity is to uphold an important ideal but to invoke that concept is not the same as announcing a workable rule calculated to lead to predictable results.

### D. *THE TRIAL COURT'S RELIANCE ON* ROMANELLI

The only other basis for the trial court's decision was its reliance upon *Romanelli*, 466 F.2d 872. There, IRS agents executed a search warrant at a liquor store where they suspected that illegal wagering was occurring on the premises. During the search, the proprietor, Romanelli, was detained but was not given *Miranda* warnings. He was questioned about his past gambling activ-

ities. His statements were relied upon along with other information in determining his income tax deficiency. Based solely on the *Miranda* violation, the Seventh Circuit excluded his statements from use in a civil proceeding to establish tax liability against him.

■ We are not persuaded by *Romanelli*. Nowhere does the opinion state that the Fifth Amendment was violated. Indeed, such a conclusion would have been at odds with the facts because the deficiency proceeding was civil, not criminal. The Seventh Circuit excluded the testimony not because of a constitutional violation, but because of a violation of *Miranda*. We have already explained why it is inappropriate to treat *Miranda* as if it confers rights, instead of providing a remedy for vindicating Fifth Amendment rights. *See supra* § A, 2. We are of opinion that *Romanelli* does not support the trial court's decision to exclude Ehlers' testimony. We hold that Ehlers' statements concerning his interest in the money should not have been excluded.

### E. *EHLERS' PROOF REQUIREMENT ON REMAND*

■ The remaining issue is whether the admission of Ehlers' statements concerning his knowledge or ownership of the money makes it necessary for him to adduce evidence supporting his claim or whether he can rely solely on the fact that he was in actual or constructive possession of the money at the time it was seized. In our opinion, once Ehlers' statements are introduced for consideration by the trier of fact, he can no longer rely solely on prior possession as the basis for his claim of entitlement to the money. This is so because his statements denying knowledge or ownership of the money — if believed — provide "serious reasons" to doubt his entitlement.

Appellants rely on *United States* v. *Wright*, 610 F.2d 930 (D.C. Cir. 1979), and *United States* v. *$364,960.00 In U.S. Currency*, 661 F.2d 319 (5th Cir. 1981). In *Wright*, acting on a search warrant, police officers seized $2,100 and certain narcotics paraphernalia. All charges arising out of the search were dismissed. The person from whom the money had been seized requested its return. The district court held that the claimant was required to prove entitlement to the money. The Court of Appeals disagreed and wrote as follows:

> We do not believe . . . that the mere fact of seizure requires that entitlement be established anew. The seizure of property *from someone* is *prima facie* evidence of that person's entitlement, particularly when the seized property is money — negotiable instruments difficult to identify and trace. The whole thrust of the cases that we have cited is that when property is seized from a person, the court must return it to that person when it is no longer needed by the government. The court is obligated to restore the *status quo ante. Unless there are serious reasons* (presented by the government or adverse claimants) *to doubt a person's right to the property seized from him, he need not come forward with additional evidence of ownership.*

610 F.2d at 939 (citations omitted) (emphasis added in part). In *Wright*, $1,500 was taken out of the claimant's pocket and $600 was taken out of a dresser drawer in the bedroom used by another claimant. Further, the claimants never denied knowledge or ownership of the money which was seized.

■ Appellants submit, and we agree, that the crucial question is whether Ehlers' statements are sufficient to meet the exception in *Wright* concerning the existence of "serious reasons" to doubt Ehlers' entitlement to the money. In *$364,960.00 In U.S. Currency*, the Fifth Circuit considered *Wright* and concluded that a denial of ownership by the claimant raised serious questions sufficient to rebut the presumption of entitlement arising from prior possession.

In *$364,960.00 In U.S. Currency*, police officers who were lawfully in an apartment investigating a traffic accident observed, in plain view, what appeared to be illegal drugs, drug paraphernalia, and a weapon. The police officers secured a search warrant and upon executing the warrant, found three suitcases containing $364,960 in cash. The apartment was occupied by three men; all denied knowledge or ownership of the money. They were all charged with crimes but the charges were either dismissed or dropped. The three men assigned any interest in the money to their defense attorney who asserted a claim for the return of the money based on *Wright*. The Fifth Circuit held that *Wright* did not require a return of the money because "denial of ownership by the party whose interest is sought to be proved may alone be suffi-

cient to rebut the presumption of entitlement that arises from possession." *Id.* at 327.

We are unpersuaded by the cases relied on by Ehlers on this issue. Those cases did not involve claimants who originally denied knowledge or ownership of money. *See Fonseca v. Regan*, 734 F.2d 944 (2d Cir.), *cert. denied*, 469 U.S. 882 (1984); *Dunbar* v. *United States*, 502 F.2d 506 (5th Cir. 1974); *Ferris v. United States*, 501 F. Supp. 98 (D. Nev. 1980).

## III. *CONCLUSION*

For all the foregoing reasons, the judgment of the trial court will be reversed and the case remanded for further proceedings consistent with this opinion.

*Reversed and remanded.*

COMPTON, J., concurs in the result.