**Hiram H. HOELZER, Plaintiff,**

v.

**The CITY OF STAMFORD, CONNECTICUT, Defendant.**

**No. 89 Civ. 0641.**

United States District Court, S.D. New York.

Oct. 16, 1989.

Stephen A. Wise, Wise and Layton, New Canaan, Conn., for plaintiff.

Deborah M. Steeves, Barry J. Boodman, Corp. Counsel, Stamford, Conn., for defendant.

## OPINION AND ORDER

STANTON, District Judge.

Hiram Hoelzer, a professional art restorer, seeks a declaratory judgment to quiet title to a mural originally affixed to the walls of Stamford High School. At a pretrial conference on May 12, 1989 plaintiff and defendant City of Stamford (the "City") agreed to a trial on stipulated facts on the issue of title to the mural.

Mr. Hoelzer contends that the City abandoned the mural, and that its claim of ownership is time-barred. The City contends that its claim is not barred by the statute of limitations because it did not know that Mr. Hoelzer claimed ownership of the mural until 1986.

### FACTS

As part of the Works Progress Administration ("W.P.A.") of the United States, James Daugherty painted a large mural[1] on the walls of Stamford High School (the "School") in 1934. The mural, about eight feet high and over 100 feet long, depicts a "variety of scenes representing life.... Scenes vary from an area depicting drama to the political crash of Wall Street with a cliche politician, cigar in mouth and money in hand. Others seem to be of urbanization and industrialization and social unrest or change."[2]

In the late 1960's the City decided to renovate the School. The architects planning the renovations wrote to Dr. Joseph Porter, the City's Superintendent of Schools, advising him that

[T]he mural will be subject to damage from several causes....

It would be better, in our opinion, to have the mural removed from the building permanently. If it is desired to preserve the mural, possibly the local historical society or some similar agency would provide a suitable repository. If it is to be thus preserved, the mural should be removed prior to the start of actual Phase I construction work.[3]

Dr. Porter responded:

At the regular meeting of the Board of Education held on March 29, 1967, it was decided that the mural in question should

not be damaged in any way, and, therefore, you are requested to remove it from the wall and roll it for proper storage.[4]

No other communications took place between School or City officials and the architects regarding the mural.

However, in 1968 Roger C. Preu, head of the School's art department, asked an architect on the renovation not to do anything with the mural before contacting him, told the City's Clerk of the Works to save the mural, and also

told several people, including the School's principal, that if the murals were going to be thrown out they should be saved, that there were many famous local people who were in the murals and that, if worse came to worst, sections could be cut out and auctioned off for an art scholarship for children ... rather than just getting rid of them.[5]

During the School's 1970 summer vacation workmen took the mural down, and either they or others put the mural "outside on top of a heap of construction trash which was either next to a dumpster outside of the School building or overflowing from the dumpster."[6]

When Mr. Preu returned from his 1970 summer vacation and noticed the mural was gone, he asked the workmen, a School custodian, and the School's principal where it was but none knew. Over the next five or six years, he discussed the mural's disappearance with School teachers and administrators.[7]

Frank Bowne, a 1970 graduate of the School, found the mural cut into 30 pieces and "rolled up together in a pile of trash next to the school. Not knowing what [he] was going to do with it but appreciating its

---

1. Some documents refer to Mr. Daugherty's work as "the mural" and others as "the murals."

2. December 10, 1980 Memorandum from John C. Nerreau, Coordinator of Art and Music, Stamford Public Schools to Dr. Thomas F. Reardon, Acting Superintendent of Schools (the "Nerreau Memo").

3. March 24, 1967 Letter from Frank G. Lopez of Ballard Todd Associates to Dr. Joseph Porter, Superintendent of Schools.

4. April 3, 1967 Letter from Joseph B. Porter to Mr. Frank G. Lopez.

5. Stipulated facts, ¶ 4.d.ii.

6. *Id.,* ¶ 6.

7. *Id.,* ¶ 9.

age and era [Mr. Bowne] managed to get it into [his] car and drove home." [8]

On August 25, 1971 Mr. Bowne wrote to Mr. Karel Yasko explaining his finding of the mural and "invit[ing] you to come see it to consider restoration and relocation." [9] Mr. Yasko, until his death in 1985, worked for the General Services Administration ("G.S.A.") maintaining its Fine Arts Inventory Project and supervising restoration of W.P.A. artwork.

> Mr. Yasko replied on September 27, 1971: For your singular gesture of rescuing the James Daugherty mural from the trash pile you are to be commended....
>
> ....
>
> We are most certainly interested in restoring, preserving and relocating the mural, preferably in the community and in a location where it would receive maximum exposure. The high school would be a logical place but they already indicated their opinion when it was consigned to the trash pile.[10]

Mr. Yasko suggested that Stewart G. Rosenblum, his former summer intern, inspect the mural at Mr. Bowne's home.

With Mr. Bowne's permission [11], Mr. Rosenblum took the mural in October 1971 and, at Mr. Yasko's direction, delivered it to Mr. Hoelzer's home in Armonk, New York. Mr. Rosenblum recalls:

> The murals were given to me as a donation by the young man to the United States Government and I delivered them in the loosely rolled up or folded condition (I don't remember which) in which I had received them to Mr. Hoelzer on behalf of the United States Government. It was my understanding that Mr. Hoelzer was to store the murals on behalf of the United States Government, stabilize

them and restore them when money could be found, returning them to the United States Government when so instructed. It is my recollection that Mr. Yasko followed this procedure in other instances.[12]

Mr. Hoelzer then brought the mural to his studio and workshop in Manhattan.

In an April 25, 1972 letter to Mr. Yasko, Mr. Hoelzer explained the deteriorated condition of the mural in detail and what its restoration would entail:

> Restoration:—Remove glue, flatten canvases, clean paintings, retouch, prevent further flaking, and roll them (and identify), ready for storage or rehanging There [sic] are about 900 square feet of canvas so it is quite a job. Cost: —$ 6,400.— [13]

During the 1970's neither the City nor the School took any steps to locate the mural or ascertain whether it was properly in storage.

Charles Daugherty, the artist's son, received a letter in January 1972 from Mr. Yasko, and learned from him that Mr. Hoelzer had the mural.[14] In the late 1970's Mr. Daugherty indignantly told Mr. Hoffman, who had been president of the City's Board of Education during 1971, that the murals were still in existence. Mr. Hoffman apparently asked Dr. Thomas F. Reardon, Acting Superintendent of Schools, to look into the issue.[15] At Dr. Reardon's direction, Mr. Nerreau, Director of Art and Music for the Stamford Public School System, visited Mr. Hoelzer at his studio in December 1980. According to Mr. Hoelzer and one of his employees, Mr. Nerreau claimed that the mural belonged to the City. (Mr. Nerreau disputes this assertion).[16] On December 10, 1980 Mr. Ner-

---

**8.** August 25, 1971 Letter from Frank Bowne to Mr. Karel Yasko, Fine Arts Inventory Project, General Services Administration.

**9.** *Id.*

**10.** September 27, 1971 Letter from Karel Yasko to Mr. Frank Bowne.

**11.** Mr. Bowne does not claim any interest in the mural. (Stipulated facts, ¶ 7.1)

**12.** September 18, 1987 Letter from Stewart G. Rosenblum to Dr. Arlene Quint, G.S.A.

**13.** April 25, 1972 Letter from Hiram H. Hoelzer to Mr. Karel Yasko.

**14.** Stipulated Facts, ¶ 10.a.

**15.** *Id.,* ¶¶ 10.d, 12.a

**16.** Supplemental Stipulated Facts, ¶ 1.

reau prepared a report for Dr. Reardon in which he stated:

> Hiram Hoelzer assures me the restoration can be done to renew these murals to the vibrancy in which they originally were. However it is very costly. He quickly stated a particular panel 100″ × 5′ would cost about three thousand dollars.
>
> I recommend we talk to the mayor about possibilities of use in the civic area of the city and applying for a federal grant....
>
> ....

Please advise where we go from here.[17] Dr. Reardon did not advise Mr. Nerreau with respect to the mural.

April J. Paul, a Ph.D. candidate at the City University of New York, also visited Mr. Hoelzer at his studio in 1980. In the course of researching James Daugherty's work, Ms. Paul had learned of the mural and spoken to Mr. Yasko who told her that Mr. Hoelzer had the mural. In a thank-you note to Mr. Hoelzer, she wrote:

> Since the assistant principal of the Stamford High School, where the mural was originally placed, believes that the mural should be replaced there, I am writing to Karel Yasko in Washington to suggest he follow up on this idea to see if something can be worked out.[18]

Ms. Paul wrote Mr. Yasko:

> You expressed interest in finding a public area in which to replace these murals. One of the loose ends I followed in my research was to telephone the Stamford High School office to see if the original architecture still stood; it does indeed. On May 19, I spoke to the assistant principal, a Mr. Walter O'Meara (202) 358–4275. He was extremely enthusiastic about the old murals having been found andplacedinto [sic] the hands of a conservator. I suggested replacing them in their original place and he agreed this

seemed a good idea—I do not know if this is possible and this is all the further I have taken it. As I recall from our conversation, you would go ahead with having Mr. Hoelzer restore the mural when a suitable place could be located. Since you and your office carry this power, I wonder if you might consider this most tentative of ideas?[19]

Ms. Paul did not hear from either Mr. Hoelzer or Mr. Yasko.

Nonetheless, Ms. Paul maintained her interest in the mural. In September 1982 she wrote to the City's Board of Education stating that the mural was "now in the hands of a conservator in New York City awaiting funds for restoration" and asking "who ordered the murals removed, when and why this was done?"[20] After two months had passed without a response, Ms. Paul sent a second letter but it, too, went unanswered.

Sometime during 1981 Mr. Hoelzer called Mr. Yasko and reported on Ms. Paul's, Mr. Nerreau's and Mr. Daugherty's visits. Mr. Hoelzer complained that "he was being abandoned by the G.S.A. with the murals without their being relocated and without any compensation to him."[21] Michael Ragone, an art restorer in plaintiff's employ, overheard Mr. Hoelzer say to Mr. Yasko that "everything had been dumped on him and that the murals were his."[22]

The City waited until 1986 before it next contacted Mr. Hoelzer. Marguerite Strop, the City's Public Arts Director, visited Mr. Hoelzer on August 6, 1986. Ms. Strop was investigating the City's collection of W.P.A. and other New Deal era art and received Mr. Hoelzer's name from the G.S.A. "She intended to make an application on behalf of the City for a National Endowments Grant for the restoration of the murals, but the plaintiff refused to cooperate."[23]

---

17. Nerreau Memo.

18. July 1, 1980 Letter from April J. Paul to Hiram.

19. July 3, 1980 Letter from April J. Paul to Mr. Yasko.

20. September 17, 1982 Letter from April Lapland Paul to Stamford Board of Education.

21. Stipulated Facts, ¶ 13.

22. *Id.,* ¶ 26.b.iii.

23. *Id.,* ¶ 14.f.

Sometime during the summer of 1986 Mr. Hoelzer called the G.S.A. with respect to "an ownership disclaimer to the Dougherty [sic] murals from the Stamford High School." [24] The G.S.A. sent Mr. Hoelzer a March 26, 1934 policy memorandum from an Assistant Secretary of the Treasury entitled "Legal Title to Works Produced under the Public Works of Art Project" which provides that "[a]ll works of art executed with the intent that they should occupy a particular place in some public building are to be treated as a part of that building." The G.S.A. stated that since the mural fell within that category, it is "not within the purview of ownership and/or maintenance by the Federal Government"—and suggested the matter be resolved directly with the City. [25]

Shortly thereafter, the City's Department of Law wrote to Mr. Hoelzer:

It has come to my attention that you are in possession of murals painted in Stamford High School by James Dougherty [sic]....

The City of Stamford was pleased to learn the murals have been held in great care by a man of your expertise. As the owner of these works of art, we are anxious for their return....

....

Your care in storage and restoration will be appreciated now and for generations to come. As you are informed of the status of these panels, you, of course, will not consider presenting them for any alternate display or ownership. [26]

On October 14, 1986 Mr. Hoelzer responded:

1. The murals were knowingly trashed by Stamford more than fifteen years ago.

2. As such, Stamford has no legal claim to them.

3. They belong to me. [27]

The City again wrote to Mr. Hoelzer on November 13, 1986, stating:

In a very legal sense, you took these murals knowing exactly what they were and that they did not obviously belong to the person you accepted them from. As you have indicated in your own correspondence to the federal government, you have realized from the beginning that these panels were not yours....

....

If necessary, we are prepared to bring legal action to prove our title to the murals or to prevent any transfer of the same. [28]

On May 8, 1987 two attorneys for the City examined the mural at Mr. Hoelzer's workshop. When the City's mayor and other representatives examined the mural on July 5, 1988, they claimed that it belonged to the City, a position Mr. Hoelzer rejected. [29]

On January 10, 1989 Mr. Hoelzer commenced this suit in New York Supreme Court, Westchester County, seeking a declaratory judgment to quiet title. The City removed the case to this court, and asserts that it owns the mural.

Sotheby's appraised the mural's value at $1,250,000 [30] and the firm of Connecticut Fine Arts at $90,000 to $100,000. [31]

## DISCUSSION

Mr. Hoelzer contends that the School abandoned the mural, and that any claim of ownership it might have is barred by the statute of limitations. The City counters

24. August 19, 1986 Letter from William R. Lawson, G.S.A. Deputy Assistant Commissioner for Real Property Development, to Mr. Hiram Hoelzer.

25. *Id.*

26. September 25, 1986 Letter from Michael Gene Clear to Mr. Hiram Hoelzer.

27. October 14, 1986 Letter from Hiram H. Hoelzer to Mr. Michael Gene Clear.

28. November 13, 1986 Letter from Michael Gene Clear to Mr. Hiram Hoelzer.

29. Stipulated facts, ¶ 20, 22.

30. May 7, 1987 Letter from Deborah Coy Ahearn, Vice President and Director, Sotheby's, to Mr. Hiram Hoelzer.

31. June 3, 1987 Appraisal of Burt Chernow, Connecticut Fine Arts, at the request of Margurite [sic] Strop.

that Mr. Hoelzer has never had an ownership interest in the mural, and has merely held it for the purposes of restoration. It also argues that its claim is not time-barred because Mr. Hoelzer did not refuse its demand until October 1986.

### 1. Abandonment

█ Notwithstanding the School's less than careful treatment of the mural, it did not abandon the mural during the 1970 summer recess.

The doctrine of abandonment requires both an intent to abandon the property and acts constituting abandonment.

> Abandonment is always voluntary and involves a positive intention to part with ownership. It is essential that the owner act without coercion or pressure.... [and that] there is a total desertion by the owner without being pressed by any necessity, duty, or utility to himself, but simply because he no longer desires to possess the thing and willingly abandons it to whoever wishes to possess it.

*Katsaris v. United States*, 684 F.2d 758, 762 (11th Cir.1982) (citations omitted). *See also Idaho v. Oregon Short Line R. Co.*, 617 F.Supp. 213, 217 (D.Idaho 1985) (abandonment requires "(1) present intent to abandon, and (2) physical acts evidencing clear intent to relinquish the property interest."); *Mombro v. Louis Capano & Sons, Inc.*, 526 F.Supp. 1237, 1240 (D.Del.1981) (abandonment requires "intent to relinquish a known right of interest").

The City did not perform, or knowingly acquiesce in, "physical acts evidencing clear intent to relinquish the property interest." *Idaho v. Oregon Short Line R. Co.*, 617 F.Supp. at 217.

The only statement of the City's intent is the April 3, 1967 letter from its Superintendent of Schools stating that the Board of Education wished the architects "to remove [the mural] from the wall and roll it for proper storage." That the City's wishes were not fulfilled by the workmen or more forcefully conveyed to those responsible for the mural's storage, does not establish that the City intended to part with the mural.

Nor should an intent to abandon be inferred from the City's apparent failure to investigate the missing mural. Only Mr. Bowne, Mr. Yasko and Mr. Hoelzer knew of the mural's whereabouts, and none chose to ask the City if, despite appearances to the contrary, it had any interest in the mural. *See U.S. v. Taglione*, 546 F.2d 194, 198 (5th Cir.1977) ("It is the duty of a finder of lost goods to return them to the owner if he is known and, if the owner is unknown, to follow the reasonable procedures for discovering the true owner."). For all City officials knew, the mural was properly in storage. *See Mucha v. King*, 792 F.2d 602, 610 (7th Cir.1986) ("Abandonment is a voluntary relinquishment of rights, see e.g., *Menzel v. List*, 49 Misc.2d 300, 305, 267 N.Y.S.2d 804, 809–10 (Sup.Ct. 1966), aff'd as modified, 28 A.D.2d 516, 279 N.Y.S.2d 608 (1967) (per curiam), rev'd, 24 N.Y.2d 91, 298 N.Y.S.2d 979, 246 N.E.2d 742 (1969) (reinstating trial court's award of damages), and thus implies ... knowledge of those rights.").

### 2. Statute of Limitations

The City is entitled to the mural's return only if it asserted its claim within the relevant statute of limitations.

#### a. *The applicable statute of limitations*

█ In diversity cases, federal courts apply the law of the forum state, including its choice of law rules. *Klaxon v. Stentor Electronic Mfg. Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). In New York, actions that accrue within the state are governed by the state's statute of limitations, while those that accrue outside of New York are governed by either the New York or foreign statute limitations period, whichever is shorter. N.Y. C.P.L.R. § 202 (McKinney 1972 & Supp.1989); *DeWeerth v. Baldinger*, 836 F.2d 103, 106 (2d Cir. 1987) (citing *Martin v. Julius Dierck Equip. Co.*, 43 N.Y.2d 583, 403 N.Y.S.2d 185, 187, 374 N.E.2d 97, 99 (1978)), *cert. denied*, —— U.S. ——, 108 S.Ct. 2823, 100 L.Ed.2d 924 (1988).

Under New York law, personal property is governed by the law of the state where the property is located. 19 *N.Y. Jur.* § 24. *See also Kunstsammlungen Zu Weimar v. Elicofon*, 536 F.Supp. 829, 846–47 (E.D. N.Y.1981) (validity of transfers of personal property are governed by law of state where property is located), *aff'd*, 678 F.2d 1150 (2d Cir.1982). Because the mural is located in New York, any claim to it accrues in New York, and its statute of limitations applies.

Since the underlying coercive action in this declaratory judgment action is a tort claim for interference with property such as conversion or trespass to chattels, analysis of this choice of law issue under New York's "interest analysis" or "significant relationship" test seems appropriate.[32] *See Elicofon*, 536 F.Supp. at 846. Interest analysis also applies when determining where a claim accrued for statute of limitations purposes. *Martin*, 403 N.Y.S.2d at 189, 374 N.E.2d at 101. Under traditional tort principles, the law of the place of injury invariably controlled, and under interest analysis this is still the general rule. *Elicofon*, 536 F.Supp. at 846. *See also Schultz v. Boy Scouts of America*, 65 N.Y.2d 189, 491 N.Y.S.2d 90, 95, 480 N.E.2d 679, 684 (1985) (place of wrong and parties' domicile are "almost exclusively" most significant contacts). Absent "special circumstances," the law of the place of injury applies. *Bader v. Purdom*, 841 F.2d 38, 40 (2d Cir.1988) (citing *Neumeier v. Kuehner*, 31 N.Y.2d 121, 335 N.Y.S.2d 64, 286 N.E.2d 454 (1972)). Because there are no other special circumstances for replacing the place of injury rule and any injury to the City caused by Mr. Hoelzer would have occurred in New York, where he took possession and stored the mural, New York law governs.

#### b. *Application of the New York statute of limitations*

The pertinent statute of limitations provides that all actions for recovery of or injury to chattels must be commenced within three years. N.Y. C.P.L.R. § 214(3) (McKinney 1972 & Supp.1989).

In order for the owner of property to have a claim against one in rightful possession, the owner must first make a demand on the possessor. *See Agawam Trading Corp. v. Mayer Malbin Co.*, 37 A.D.2d 946, 325 N.Y.S.2d 757 (1st Dep't 1971). This demand may not be unreasonably delayed. *DeWeerth*, 836 F.2d at 107. The parties disagree on how Mr. Hoelzer's possession of the mural should be characterized. Mr. Hoelzer claims that he is similar to a good faith purchaser, while the City asserts that he is a bailee. Under either characterization, Mr. Hoelzer's possession is "rightful." *See Elicofon*, 678 F.2d at 1161 (good faith purchaser is in lawful possession until demand), *Heneghan v. Cap–A–Radiator Shops*, 132 Misc.2d 936, 506 N.Y.S.2d 132, 134 (D.Ct.1986) (bailee repair shop is in lawful possession of automobile left with it until demand is made). Therefore, in order for the statute of limitations to have run on the City's claim against Mr. Hoelzer, the City's demand must have been unreasonably delayed.

In *DeWeerth v. Baldinger*, a Monet painting was stolen during or immediately after the Second World War. *DeWeerth*, 836 F.2d at 105. The owner, DeWeerth, made several lackluster attempts to recover the Monet.[33] It was ultimately discovered in the hands of a good faith purchaser in

---

**32.** It is important to note that the interest of the states in applying their statute of limitations is not the relevant inquiry here. Rather, § 202 and New York's choice of law rules for the statute of limitations are concerned with where the underlying claim accrued. If the claim accrued in New York, it will provide the statute of limitations. Therefore, the inquiry is which state has the greatest interest in any property-related tort the City might have had as a result of Mr. Hoelzer's actions.

**33.** DeWeerth made inquiries with the military authorities in 1946, made an insurance claim in 1948, sent a letter to an art professor in 1955, and sent a list of her missing artwork to the West German authorities in 1957. *DeWeerth*, 836 F.2d at 105. She made no further attempts to locate the Monet. *Id.*

1982. *Id.* at 105–06. The court held that there is "a duty of reasonable diligence in attempting to locate stolen property, in addition to the undisputed duty to make a demand for return within a reasonable time after the current possessor is identified." *Id.* at 108.[34] It found that DeWeerth had failed to exercise reasonable diligence in looking for the Monet.

There are important differences between this case and *DeWeerth.* Perhaps the most significant is that Mr. Hoelzer is not a good faith purchaser. He did not give any value for the mural, expecting to buy it. Rather, he expected to return it to the appropriate owner at the appropriate time. Instead of being damaged by being forced to return the mural, as a good faith purchaser would be, Mr. Hoelzer would receive a windfall by being allowed to keep it. The equitable rule in *DeWeerth* was not designed for this inequitable result.

Nor does the holding in *DeWeerth* mandate this outcome. *DeWeerth* requires an owner to act reasonably in seeking return of property. *DeWeerth,* 836 F.2d at 108. "The question of what constitutes unreasonable delay in making a demand that starts the statute of limitations depends upon the circumstances of the case." *Id.* at 110. Under the circumstances the City did not act so unreasonably as to deprive it of the mural.

Initially, City officials might have reasonably assumed that the mural was in storage at the School. However, they knew that Mr. Hoelzer had the mural as early as the late 1970's, when Mr. Daugherty, the artist's son, discussed the mural with Mr. Nerreau, the School's Director of Art and Music. Mr. Nerreau visited Mr. Hoelzer and inspected the mural in 1980. In 1982, Ms. Paul twice wrote to the School indicating that she knew where the mural was. The School could have located and repossessed the mural, yet it did not.

However, the need to act did not appear urgent. The City knew that the mural had been given to an art restorer. Mr. Hoelzer did not make an explicit claim of ownership until the City requested return of the mural in 1986. In 1972, Mr. Hoelzer sent Mr. Yasko an estimate for restoring the mural. In 1980, he wrote to Mr. Daugherty requesting some pictures of the mural taken when it was in place at the School.[35] In that letter, Mr. Hoelzer stated that he hoped that the pictures would help "get the Government moving." [36] These are the statements of a custodian, not an owner, although Mr. Hoelzer apparently believed the G.S.A., rather than the City, owned the mural. Indeed, there is no evidence of a claim of ownership by Mr. Hoelzer prior to the City's demand.[37]

The requirement that a demand not be unreasonably delayed focuses on the actions of the true owner. *DeWeerth,* 836 F.2d at 107 n. 4. However, in assessing the reasonableness of the owner's actions, the possessor's conduct may be relevant. *See id.* at 112: Mr. Hoelzer did nothing until 1986 that might have alerted the City to an adverse claim. It was reasonable for City officials to believe that, as long as Mr. Hoelzer did not assert ownership over the mural, he continued to possess it as a custodian or bailee.

**34.** Under New York law, the owner must make a demand on a good faith purchaser of stolen property before there is any cause of action against the purchaser. *Elicofon,* 678 F.2d at 1161. In cases where a demand is necessary, the statute of limitations begins to run "when the right to make the demand is complete." N.Y. C.P.L.R. § 206(a) (McKinney 1972 & Supp. 1989). However, this provision only applies to demands that are procedural, which means the cause of action existed and the defendant's conduct giving rise to the claim was complete before the demand was made. *Elicofon,* 678 F.2d at 1161. It does not apply where, as in the case of a good faith purchaser or a bailee, a demand is substantive, or in other words where a de-

mand is an element of the plaintiff's prima facie case. *Id.* Instead, in cases where the demand is substantive, the analysis set forth in *DeWeerth* applies.

**35.** August 22, 1980 Letter from Hiram H. Hoelzer to Charles M. Daugherty.

**36.** *Id.*

**37.** In 1981 Mr. Hoelzer complained to Mr. Yasko that he was being abandoned with the murals and that "they were his." Stipulated Facts, ¶ 26.b.iii. However, this statement was never communicated to the City.

**1114**

The City can be faulted for leaving a valuable piece of art in storage for so long. However, this blame should not, and does not, give title to Mr. Hoelzer who paid nothing for the mural and has no claim to it other than his preservation and storage of it for its owner, until he determined that it should be his.

### CONCLUSION

The City owns the mural. The first alleged cause of action, to quiet title, is dismissed on the merits.

A conference will be held on November 17, 1989 at 4:20 P.M. with respect to the remaining cause of action, for the reasonable value of Mr. Hoelzer's services.

So ordered.