Linda R. Kelly, Esq. Informal Opinion Deputy County Attorney No. 2003-17 Monroe County County Office Building 39 West Main Street Room 307 Rochester, New York 14614
Dear Ms. Kelly:
You have asked how the district attorney's office should dispose of various items of personal property that were seized as evidence during criminal investigations. Your letter identifies two categories of property as the particular subjects of your inquiry. The first category consists of clothing seized by the district attorney as part of an investigation into trademark counterfeiting. According to your letter, the seizure of this clothing never led to the initiation of criminal charges and no criminal charges can be brought at this point in time. The district attorney's office is still holding the property and "no request for return has been [made] by the businesses involved (some of the businesses may no longer be in operation)."
The second subject of your inquiry is monies seized in "relatively small amounts" by "various law enforcement agencies" as part of the investigation and prosecution of drug offenses. According to your letter, "the cases have been disposed of" — that is, the cases either were not prosecuted or the prosecutions are complete — and "[n]o formal forfeiture was sought." And, again, "no person ever sought return of the monies."
Despite the differences between these two categories of property, the basic answer is the same as to each. The government[1] has the authority to seize property as part of a criminal investigation, and to retain the property until the investigation or prosecution is resolved. But when the government's need for the property ends, so does the government's right to it. The property at issue here does not qualify as contraband per se, and the county has apparently chosen not to initiate a forfeiture proceeding. Thus, the government may return the property to the person from whom it was seized or hold the property as the custodian for the true owner. If the government is unable to locate the person from whom the property was seized or does not wish to retain it, then it may treat the property as lost property, in compliance with New York's lost property statute, or transfer the property to the state comptroller.
General Principles
Though the government may seize and hold a citizen's property in connection with a criminal investigation or prosecution, due process ordinarily requires the government to return the confiscated property to its owner "once those proceedings have terminated or it is determined that the property is not related to or is otherwise not needed for those proceedings." DeBellis v. Property Clerk of City of New York, 79 N.Y.2d 49,57 (1992). Because the seized monies and clothing no longer have any evidentiary value, your case implicates this general rule.
There are several qualifications, however, to the general obligation of return. The government is not required to return "contraband per se," that is, "objects the possession of which, without more, constitutes a crime." Lipscomb v. Property Clerk of the City of Newburgh Police Dep't,188 A.D.2d 993, 994 (3d Dep't 1992). And the government ordinarily is not required to return confiscated property to its owner unless the owner makes a "demand" for the property. DeBellis, 79 N.Y.2d at 57. Finally, as an alternative to returning confiscated property to its owner, the government may, where permitted by statute, initiate a forfeiture proceeding. See, e.g., CPLR § 1311. In the analysis that follows, we consider whether the first two of these qualifications apply to your circumstances; because you indicate that you have elected not to pursue forfeiture, this option is not addressed. Additionally, our opinion provides guidance on other available options should you deem retention or return of the property inadvisable or impractical.
A. Property is Not Contraband Per Se
In our view, the property in question is not "contraband per se" that the government need not return. Contraband is divided into two types. The first is "contraband per se" — that is, "objects the possession of which, without more, constitutes a crime." Lipscomb, 188 A.D.2d at 994. Examples of contraband per se include cocaine and counterfeit currency.See Boggs v. Merletti, 987 F. Supp. 1, 10 (D.D.C. 1997). The government has no obligation to return contraband per se to its putative owner, since an individual "cannot have a property right in that which is not subject to legal possession." Cooper v. City of Greenwood, 904 F.2d 302,304-05 (5th Cir. 1990).
The second type of contraband is "derivative contraband." Derivative contraband is property that is subject to forfeiture as a result of its association with an unlawful activity. One example of derivative contraband is an automobile that has been used in a bank robbery. UnitedStates v. Rodriguez Aguirre, 264 F.3d 1195, 1212 n. 13 (10th Cir. 2001). Though derivative contraband often is subject to forfeiture, the property must be returned to the owner if the government declines to initiate a forfeiture proceeding. Id.; see also Short Stop Indus. Catering Corp. v.City of New York, 127 Misc.2d 363, 367 (Sup.Ct. N.Y. Co. 1985) (property that may lawfully be possessed is not subject to forfeiture in the absence of a statute).
Your question concerns two different kinds of property: currency seized "in relation to drug offenses" and clothing seized during an investigation of trademark counterfeiting. The currency seized in relation to drug offenses is not contraband per se. If it is subject to forfeiture, it is subject to forfeiture only because of its association with illegal drug transactions. Because the government has not initiated a forfeiture proceeding with respect to this currency, it still belongs to the persons from whom it was seized.
The counterfeit merchandise poses a more difficult question. Both state and federal law prohibit trademark counterfeiting. See Penal Law § 165; 18 U.S.C. § 2320. But neither state nor federal law criminalizes the mere possession of goods bearing a counterfeit trademark. The federal trademark-counterfeiting statute applies only to those who "intentionally traffic or attempt to traffic in goods or services and knowingly use a counterfeit mark on or in connection with such goods and services." 18 U.S.C. § 2320(a). New York's Penal Law is similar. It prohibits only the manufacture, distribution, sale, and offering for sale of goods that bear counterfeit trademarks. Penal Law § 165.71,165.72, 165.73. And to fall within this prohibition the conduct must be accompanied by an intent to deceive someone or an intent to evade a lawful restriction on the sale of such goods. Id. The Penal Law also prohibits the possession of "a trademark knowing it to be counterfeit for the purpose of affixing it to any goods." Id. But presumably no such purpose could be shown where the defendant possesses goods to which the counterfeit trademark already has been affixed.
Something akin to an outright prohibition on the possession of counterfeit merchandise does appear in the federal statutes governing transportation. Section 80302 of title 49 makes it unlawful to transport "contraband" in an aircraft, vehicle, or vessel, or to possess "contraband" in a aircraft, vehicle, or vessel; the statute defines "contraband" to include "any good bearing a counterfeit mark." The use in this statute of the word "contraband," though, is not dispositive of our analysis, since some of the goods classified as "contraband" in49 U.S.C. § 80302 are plainly not contraband per se. See, e.g.,49 U.S.C. § 80302(a)(2) (classifying guns involved in violation of federal occupational tax laws as contraband).
Moreover, although § 80302 makes various forms of conduct "unlawful," it is a forfeiture statute rather than a criminal statute. The only apparent consequence of violating 49 U.S.C. § 80302 is the one specified in 49 U.S.C. § 80304: the seizure and forfeiture of the vehicle used to transport the contraband. Unlike a typical federal criminal statute, 49 U.S.C. § 80302 does not specify any punishment for a person who violates it. Cf. 49 U.S.C. § 80501 (defining offense of "damage to transported property" and specifying penalties for the offense). Nor do the federal sentencing guidelines make any mention of penalties for this offense. See Federal Sentencing Guidelines, Appendix A. Since 49 U.S.C. § 80302 does not really appear to make any conduct "criminal," and since it requires something more than mere possession in any event, it cannot justify the conclusion that counterfeit goods are "objects the possession of which, without more, constitutes a crime."[2]
Notably, both federal law and state law contain specific provisions permitting or requiring the destruction of goods bearing counterfeit trademarks. But these provisions apply only where someone is charged criminally with trademark counterfeiting. Penal Law § 165.74
requires the destruction of seized counterfeit goods once the defendant is convicted of selling or producing counterfeit goods. Its federal counterpart, 18 U.S.C. § 2320(b), permits the destruction of counterfeit goods "[u]pon a determination by a preponderance of the evidence that any articles in the possession of a defendant in a prosecution under this section bear counterfeit marks." Although these sections could be viewed as suggesting that Congress and the state legislature view counterfeit goods as intrinsically dangerous, neither of these bodies has prohibited the possession of counterfeit merchandise or required its destruction or forfeiture except in connection with a prosecution for trademark counterfeiting, which has not occurred here.
Because the state and federal criminal statutes governing trademark counterfeiting do not prohibit the mere possession of counterfeit merchandise, we conclude that merchandise bearing counterfeit trademarks is not contraband per se.
B. Consequence of Owner's Failure to Demand Return of Property
Because the property you describe is non-contraband, there is no legal obstacle to returning it to its owners. Though the government's continued possession of this property will not become wrongful until the owner makes a "demand" for the return of the property, DeBellis, 79 N.Y.2d at 57, the government is not required to await the owner's demand. Nor is the government required to undertake an exhaustive investigation to identify the property's true owner, rather than simply returning it to the person from whom it was seized. The courts have recognized that "seizure of property from someone is prima facie evidence of that person's entitlement," United States v. Wright, 610 F.2d 930, 939 (D.C. Cir. 1979), and that seized property therefore may be released to the person from whom it was seized. Your letter does not indicate whether anyone other than the persons from whom the property was seized has asserted an interest in the property. If, as seems likely, no one else has asserted an interest in the drug monies or the counterfeit clothing, then the government faces little risk in simply returning the property to the persons from whom it was seized.[3]
You raise several questions about the consequence of the owner's failure to demand return of the property, and what the government should do if it is unable or unwilling to return the property to its original owners. With respect to the confiscated clothing, your letter says "no request for return has been [made] by the businesses involved." With respect to the money seized "in relation to drug offenses," your letter says "no person has ever sought return of the monies." Of both the money and the clothing, your letter asks whether, in light of the owners' failure to demand the return of their property, you "should treat this property as abandoned property." You also indicate that it may now be impossible for the government to return some of the seized property to its original owners. You mention that some of the businesses from which the counterfeit clothing was seized "may no longer be in operation," and suggest that it may be difficult or impossible to identify the persons from whom the drug monies were seized.
As explained below, neither the failure of the property owner to demand return of her property, nor the application of the adverse possession doctrine, vests title to the confiscated property in the government. There are, however, three alternatives to returning the property: (1) holding it as a custodian while awaiting a demand for return; (2) complying with the lost property law; or (3) transferring the property to the state comptroller.
1. Owner's Failure to Demand Return Does Not Vest Title In Government
At the outset, you are right to assign significance to the owners' failure to demand the return of their property. New York's courts consistently have said that the owner's right to the return of confiscated property is contingent on the making of a "demand." For example, in DeBellis, the Court of Appeals said that "due process requires that the property be returned upon demand." 79 N.Y.2d at 57
(emphasis supplied). And in Lipscomb, the Third Department said the owner's right to return of the property arises "[o]nce all criminal proceedings involving the confiscated property have terminated and a demand for the property has been made." 188 A.D.2d at 993-94 (emphasis supplied.) In People v. King, 232 A.D.2d 111, 118 (2d Dep't 1997), the Second Department said: "[A] defendant does not have a right to the automatic return of property seized in any criminal case absent a proper demand or some legal action."
But these decisions establish merely that the government may retain custody of the confiscated property until the owner demands it. They do not suggest that the government eventually acquires an ownership interest in the property as a result of the owner's failure to demand its return. Indeed, the New York Court of Appeals has concluded that an owner's failure to timely demand seized property does not constitute abandonment.
Our analysis of this issue must begin in New York City during the 1960's. During the 1960's, a person whose property was seized as evidence by city police officers, and whose property was thought to have been the proceeds or instrumentality of a crime, was automatically "deemed not to be the lawful claimant entitled to any such moneys or property."Angrisani v. Rosetti, 36 Misc.2d 523, 525 (N.Y. City. Civ. Ct. 1962) (quoting § 435-4.0 of the New York City Administrative Code). Accordingly, even if the owner had never been convicted of a crime, the owner could not recover his property without affirmatively proving, in a civil action against the property clerk, "that he has lawful title . . . and that such property or money was held and used in a lawful manner."Id. Unclaimed seized property eventually was paid into the police pension fund. McClendon v. Rosetti, 460 F.2d 111, 114 (2d Cir. 1972).
These procedures were challenged in a class action lawsuit. SeeMcClendon, 460 F.2d at 112. The Second Circuit concluded that New York City's procedures violated due process "as applied to persons from whose possession money or property, other than contraband, has been taken or obtained, though such money or property was not related to any criminal proceeding, or, if it was so related, such criminal proceedings had been terminated." Id. at 116. The principal shortcomings of the city's procedures, according to the Second Circuit, were that they forced the owners of confiscated property to initiate legal action (and prove their entitlement) in order to recover the confiscated property, and that the procedures provided the owners with no notice of how to go about recovering their property. Id. at 114-15.
After the Second Circuit declared the city's procedures unconstitutional, it remanded the case to the district court for further proceedings. Id. at 116. The district court eventually issued an unpublished order mandating the use of certain procedures by the city's property clerk. See Butler v. Castro, 896 F.2d 698, 701-02 n. 1 (2d Cir. 1990) (quoting portions of unpublished order). These procedures were summarized in DeBellis, 79 N.Y.2d at 53:
 [W]hen money or property is taken from an arrested person a voucher will be issued listing the seized items together with a notice that to obtain the return of the items, the person must submit the voucher, identification and a District Attorney's release to the property clerk. The notice is to further state that the property clerk may dispose of the money or property as provided by law if a claimant does not demand the property within 90 days after the termination of criminal proceedings or within 90 days after the issuance of a District Attorney's release.
In the years that followed the issuance of this order, courts occasionally treated the owner's failure to make a timely "demand" for the property as an "abandonment" of the property. For example, in Cooperv. Police Property Clerk of City of New York, 416 F. Supp. 49, 51
(E.D.N.Y. 1976), the court held that the claimant's suit for recovery of his confiscated property was foreclosed as a result of his failure to make a demand for his property within 90 days, as required by McClendonv. Rosetti. In Beck v. City of New York, 133 Misc.2d 265, 267 (Sup.Ct. Richmond Co. 1986), the court reached the same conclusion, saying: "[P]laintiff is deemed to have abandoned the property in question."
But the New York Court of Appeals ultimately disavowed the view that the failure to make a timely "demand" constitutes abandonment of the property. In Moreno v. City of New York, 69 N.Y.2d 432, 435-36 (1987), the Court of Appeals explained that the new "90-day demand rule" adopted inMcClendon merely "add[s] a new Federal procedure to those available under State law." It does not displace them. Thus, a person who fails to take advantage of this new procedure does not thereby relinquish his ownership interest in the property. Rather, he merely relinquishes his ability to take advantage of the "90-day demand rule." His ownership interest in the property is unimpaired, and may be enforced either in a replevin action or in an Article 78 proceeding for return of the property. Id. at 436-37.
This result is in keeping with the traditional principles of abandoned-property law, which is a close analogue to circumstances in which the government has custody of undemanded, seized property. The state's courts have held that the Abandoned Property Law "is a `custodial' statute, not an `escheat' statute." Presley v. County ofNassau, 148 Misc.2d 125, 130-31 (Sup.Ct. Nassau Co. 1990), aff'd188 A.D.2d 594 (2d Dep't 1992). In a suit by Elvis Presley's estate to recover the proceeds of unrefunded ticket sales for a concert that was cancelled after Presley's death, the court recognized that the ticket holders' interest in the unrefunded monies would never terminate; the property would be "preserved and retained by the state and made available to [the rightful owners] at any future time." Id. at 130. "Even though experience shows that abandoned property is seldom claimed, title to the property remains in the owner and never vests in the state." Id. at 131 (quoting Presley v. City of Memphis, 769 S.W.2d 221 (Tenn.App. 1988)).
Moreover, under New York law, abandonment will not be presumed. Rather, "the law demands proof both of an owner's intent to abandon the property and of some affirmative act or omission demonstrating that intention."Hoelzer v. City of Stamford, 933 F.2d 1131, 1138 (2d Cir. 1991) (applying New York law). The burden of proving abandonment rests on the party claiming ownership by default. Id. The mere fact that the owner of seized property fails to make a demand for the property in the months or years following the seizure does not supply the requisite "affirmative" proof of "throwing away" that the law requires[4]. See Foulke v. New YorkConsolid. R.R. Co., 228 N.Y. 269, 273 (1920) ("Proof supporting [abandonment] must be direct or affirmative or reasonably beget the exclusive inference of the throwing away.").
Even if the government were to meet this standard for demonstrating abandonment, it still would not be entitled to treat the property as its own, except by operation of the lost property law. This is a consequence of Personal Property Law § 251, which defines "lost property" to include most abandoned property:
 The term `lost property' as used in this article includes lost or mislaid property. Abandoned property, waifs and treasure trove, and other property which is found, shall be presumed to be lost property and such presumption shall be conclusive unless it is established in an action or proceeding commenced within six months after the date of the finding that the property is not lost property.
In effect, this section requires the finder of abandoned property either to commence an action within six months after the date of the finding seeking a declaration that the property is not "lost," or to treat the property as lost property. The procedures for handling lost property are summarized below.
2. Adverse Possession Doctrine Does Not Vest Title in the Government
One possible avenue for acquiring title to property is through expiration of the statute of limitations on an action to recover the property; in other words, through adverse possession. Application of the traditional "elements" of adverse possession to your cases, however, suggests that the government's possession of the seized property cannot ripen into adverse possession.
In order to establish adverse possession, a possessor must prove five elements: "possession was hostile and under claim of right; actual; open and notorious; exclusive; and continuous for the statutory period." Cityof Tonawanda v. Ellicott Creek Homeowners Assoc., Inc., 86 A.D.2d 118,120 (4th Dep't 1982). Hostility must be present from the inception, and the possession must remain hostile throughout the statutory period.Gallea v. Hess Realty, 128 A.D.2d 274, 275 (4th Dep't 1987), aff'd,71 N.Y.2d 999 (1988), (citing Lewis v. New York Harlem R.R. Co.,162 N.Y. 202 (1900)). Possession is not hostile when it occurs with permission of the owner "or under some right or authority derived from the owner." Id.
A lawful seizure of property by the government as part of a criminal investigation lacks the requisite element of hostility. Just as a person's use of property with permission of the owner does not imply that the person intends to assert ownership of the property, the government's seizure and retention of property as evidence does not imply that the government intends to assert ownership of the property. In both situations, the possession is entirely consistent with the original owner's continued ownership of the property. See Jasper Township v.Martin, 126 N.W. 437, 438 (Mich. 1910) ("mere permissive possession, or one consistent with the title of another, however long continued, can never ripen into a title by adverse possession"). The government's possession arguably would become hostile if the government were to refuse to return the property to its owner, while acknowledging that the property no longer had any evidentiary value. The government's possession might also become hostile if the government were to openly and notoriously use the property as its own. Cf. Songbyrd, Inc. v. Grossman,206 F.3d 172, 183 (2d Cir. 2000) ("New York has not required a demand and refusal for the accrual of a conversion claim against a possessor who openly deals with the property as its own."). Short of this, though, the government's possession of seized property is not adverse.
3. Application of New York's Lost Property Statute
The lost property law provides the only vehicle, aside from forfeiture proceedings, through which the government could obtain title to the seized property.
Personal Property Law § 252 requires that "lost property" be returned to its owner or turned over to the local police. See alsoSimmons v. Safir, 276 A.D.2d 544 (2d Dep't 2000) (applying Personal Property Law § 251 to distinguish between abandoned and lost property, and concluding that property is deemed "lost" if no action is commenced within 6 months).
As a prerequisite to depositing lost property (or the proceeds from its sale) in the local treasury or alternative fund, the police must comply with statutory procedures designed to afford notice to the original owner. Under Personal Property Law § 253(4), "[i]f at any time the police have reason to believe that a person has an interest in found property . . . and reason to know his whereabouts, they shall give notice of the finding and deposit and the location of the office to which the property . . . is transmitted to such person." The police are required again to seek out the property's original owner three months prior to the expiration of the applicable statutory period of retention. Personal Property Law § 253(8). They must send the notice "to any person [the police] have reason to believe has an interest in the property, if the address or a former address of such owner or person is known, and to all persons who have made claim to the property." Id.
The length of the statutory period for which the police must retain the property varies according to the property's value. See Personal Property Law § 253(7). For example, if the property is worth less than $100, the police need only retain the property for three months.Id. If the property is worth more than $5,000, the police must retain the property for three years. Id. If the police elect to treat the property in accordance with the lost property law, then they will be entitled to compensation for the costs of storing the property if the owner eventually turns up. Personal Property Law § 254(1). The government may sell the property prior to the expiration of the statutory period "when the expenses reasonably incurred in dealing with it . . . amount to more than one-half the amount reasonably estimated as the net sum likely to be realized by sale at public auction." Personal Property Law § 253(5)(c).
After the police have complied with the lost property law and the applicable statutory retention period has passed, the police may sell the unclaimed property at public auction and deposit the proceeds in "the treasury of the county, city, town or village in the police department of which the property was deposited." Personal Property Law §258; see also Personal Property Law § 253(8). General Municipal Law § 250 provides an alternative to simply depositing lost property in the city or county treasury. This section, which is entitled "lost and found property," provides that the governing boards of municipal corporations may adopt rules and regulations providing for "the payment of proceeds from the sale of lost property . . . into a public fund other than the treasury of the municipal corporation."
In your case, of course, the counterfeit marks on the seized clothing would have to be removed or obscured before the clothing could be sold. Penal Law §§ 165.70-.74. If the counterfeit marks could not be removed or obscured without destroying the clothing, then the clothing could not be sold or even "distribute[d]." Penal Law § 165.71. Because, under these circumstances, the clothing would be essentially valueless, the police would be justified in destroying it rather than selling it at auction. Cf. Personal Property Law § 253(5)(a) ("Property having only salvage value only may be sold by the police in such a manner as may be reasonable in the circumstances.").
Finally, we note that for purposes of the lost property law, it appears to make no difference whether the government is regarded as the "finder" of the lost property or merely the depository of the lost property. See
Personal Property Law § 251(5) (defining "finder" as "the person who first takes possession of lost property"); Personal Property Law § 256(2) ("If the finder is an officer or employee of the state or of a public corporation and takes possession of the property in the course of his official duty, the state or public corporation shall be deemed to be the finder for the purposes of section two hundred fifty-four and section two hundred fifty-seven of this chapter."). In either event, the county would acquire an ownership interest if the statutory retention period expired without the rightful owner asserting a claim to the property.
C. Transferring Custody to the State Comptroller
Another option is to ask the state comptroller to assume custody of the property. Under Abandoned Property Law § 1310, entitled "voluntary disposition of miscellaneous property not otherwise subject to this chapter," a local government entity (or anyone else) is permitted, but not required, to transfer to the state comptroller any property that has remained unclaimed for a period of two years. In order to accomplish the transfer, the local government would be required to request in writing "that the comptroller consent to receive payment or delivery of such property." Id. The written request would have to include an sworn account of "the measures taken by the petitioner constituting a diligent search for the whereabouts of the entitled person or persons." 2 N.Y.C.R.R. § 124.2. Further, the procedure is available only for intangible property or "the proceeds of a sale of tangible property." Abandoned Property Law § 1310(1). Finally, the state comptroller is not required to consent to the transfer of the property.
Obviously, transferring property to the state comptroller is not an option with respect to seized property whose owner can be located. After all, as a prerequisite to transferring the property to the state comptroller, the local government would have to undertake a "diligent search for the whereabouts of the entitled person or persons." But transferring the property to the comptroller might make sense where a local government is unable to locate the property's owner. The advantage of this voluntary procedure is that it relieves the local government of any liability to the owner of the unclaimed property. See Abandoned Property Law § 1310(3). Whether this advantage outweighs the considerable burden of searching for the property's owner is a practical decision for the local government itself.
Conclusion
Neither the clothing seized during the investigation of trademark counterfeiting nor the monies seized in drug cases qualifies as contraband per se. Given the government's decision not to initiate forfeiture proceedings with respect to this property, the government may return the property to the persons from whom it was seized, after first making certain no one else has asserted a claim to the property, or may hold the property indefinitely as the custodian of the true owner, much as the state comptroller holds abandoned property. If, after a diligent search to locate the person from whom the property was seized, the government still is unable to locate him or her, the government will be permitted to treat the property in accordance with the state's lost property statutes, and may thereby acquire title to the property. Alternatively, the government will be permitted, but not required, to ask the comptroller to assume custody of the property pursuant to Abandoned Property Law § 1310 once the property has remained unclaimed for two years.
The Attorney General renders formal opinions only to officers and departments of the State government. Thus, this is an informal opinion rendered to assist you in advising the municipality you represent.
Very truly yours,
KATHRYN SHEINGOLD, Assistant Solicitor General
In Charge of Opinions
ERIC A. JOHNSON
Assistant Solicitor General
[1] For the sake of simplicity, in this opinion we will refer to the "various law enforcement agencies" who have custody of this property simply as "the government."
[2] This section, however, appears to make it nearly impossible to possess counterfeit goods without violating federal law. In your case, for example, it would be difficult for the owners of the counterfeit clothing to resume possession of the clothing and carry it away without using a car.
[3] This is not to say, of course, that the government may ignore affirmative evidence of another person's entitlement to the property. Courts occasionally have held the government liable for returning property to the person from whom it was seized, but only where another person had previously asserted a claim to the property. See, e.g.,Capezzaro v. Winfrey, 379 A.2d 493 (N.J.Super. 1977) (government was held liable to victim of robbery for mistakenly returning money to robber after victim asserted a claim to the money); cf. Thomas v. Grupposo,73 Misc.2d 427 (N.Y. City Civ. Ct. 1973) (government was held liable to victim of theft for mistakenly selling his stolen motorcycle at a public auction).
[4] Thus this situation may be distinguished from that discussed in Op. Att'y Gen. (Inf.) No. 81-21, in which we suggested that the failure to assert a claim to funds seized by the government, coupled with a disavowal of ownership of the funds by a potential claimant, could be sufficient to constitute abandonment.